# Exhibit E

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN<br>29th JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS AND COMPLAINT | CASE NO.<br>2016 11533-CK |
|---|---|---|

**Court address**
Courthouse, 100 E State St., St. Johns, MI 48879

**Court telephone no.**
(989) 224-5140

| Plaintiff's name(s), address(es), and telephone no(s).<br>JOHN MILLER<br>(May be contacted through counsel) | v | Defendant's name(s), address(es), and telephone no(s).<br>David Briggs<br>8040 Hosbrook Rd, Ste. 315<br>Cincinnati, OH 45236<br>dbriggs@sphinxfinancial.com<br>(telephone unknown) |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Collin H. Nyeholt (P74132)<br>LAW OFFICES OF CASEY D. CONKLIN<br>4084 Okemos, Suite B<br>Okemos, MI 48864<br>(517) 522-2550 | | |

**SUMMONS**  **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued<br>NOV 2 1 2018 | This summons expires<br>JAN 2 6 2019 | Court clerk |
|---|---|---|

**Family Division Cases** (The following is information required in the caption of every complaint and is to be completed by the plaintiff.)

☐ This case involves a minor who is under the continuing jurisdiction of another Michigan court. The name of the court, file number, and details are on page _____ of the attached complaint.

☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**Civil Cases** (The following is information required in the caption of every complaint and is to be completed by the plaintiff.)

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**VENUE**

| Plaintiff(s) residence (include city, township, or village)<br>Ingham, MI | Defendant(s) residence (include city, township, or village)<br>Clinton County, MI |
|---|---|
| Place where action arose or business conducted<br>Clinton County, MI | |

| Date<br>11/14/18 | /s/ Signature of attorney/plaintiff |
|---|---|

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (6/17)  **SUMMONS AND COMPLAINT**    MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN<br>29th      JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS AND COMPLAINT | CASE NO.<br>2016 11533-CK |
|---|---|---|

**Court address**
Courthouse, 100 E State St., St. Johns, MI 48879

**Court telephone no.**
(989) 224-5140

| Plaintiff's name(s), address(es), and telephone no(s).<br>JOHN MILLER<br>(May be contacted through counsel) | | Defendant's name(s), address(es), and telephone no(s).<br>Jamal Daoud<br>1 Observatory Hill<br>Cincinnati, OH 45208<br>ajdaoud@mac.com<br>(telephone unknown) |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Collin H. Nyeholt (P74132)<br>LAW OFFICES OF CASEY D. CONKLIN<br>4084 Okemos, Suite B<br>Okemos, MI 48864<br>(517) 522-2550 | **v** | |

**SUMMONS**  **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued<br>NOV 2 1 2018 | This summons expires<br>JAN 2 6 2019 | Court clerk |
|---|---|---|

**Family Division Cases** (The following is information required in the caption of every complaint and is to be completed by the plaintiff.)
☐ This case involves a minor who is under the continuing jurisdiction of another Michigan court. The name of the court, file number, and details are on page _____ of the attached complaint.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**Civil Cases** (The following is information required in the caption of every complaint and is to be completed by the plaintiff.)
☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**VENUE**

| Plaintiff(s) residence (include city, township, or village)<br>Ingham, MI | Defendant(s) residence (include city, township, or village)<br>Clinton County, MI |
|---|---|
| Place where action arose or business conducted<br>Clinton County, MI | |

| 11/19/18 | /s/ |
|---|---|
| Date | Signature of attorney/plaintiff |

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01   (6/17)   **SUMMONS AND COMPLAINT**   MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| **STATE OF MICHIGAN**<br>29th     **JUDICIAL DISTRICT**<br>**JUDICIAL CIRCUIT**<br>**COUNTY PROBATE** | **SUMMONS AND COMPLAINT** | **CASE NO.**<br>2016 11533-CK |
|---|---|---|

| Court address | | Court telephone no. |
|---|---|---|
| Courthouse, 100 E State St., St. Johns, MI 48879 | (989) 224-5140 | |

| Plaintiff's name(s), address(es), and telephone no(s).<br>JOHN MILLER<br>(May be contacted through counsel) | **v** | Defendant's name(s), address(es), and telephone no(s).<br>Doug Sumner<br>8158 Fulton St. SE<br>Ada, MI 48072<br>dougsumner@connectedlearning.net |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Collin H. Nyeholt (P74132)<br>LAW OFFICES OF CASEY D. CONKLIN<br>4084 Okemos, Suite B<br>Okemos, MI 48864<br>(517) 522-2550 | | |

**SUMMONS**    **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued   NOV 2 1 2018 | This summons JAN 2 6 2019 | Court clerk | _[signature]_ |
|---|---|---|---|

**Family Division Cases** (The following is information required in the caption of every complaint and is to be completed by the plaintiff.)
☐ This case involves a minor who is under the continuing jurisdiction of another Michigan court. The name of the court, file number, and details are on page _____ of the attached complaint.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**Civil Cases** (The following is information required in the caption of every complaint and is to be completed by the plaintiff.)
☒ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village)<br>Ingham, MI | Defendant(s) residence (include city, township, or village)<br>Clinton County, MI |
|---|---|
| Place where action arose or business conducted<br>Clinton County, MI | |

| 11/19/18 | /s/ _[signature]_ |
|---|---|
| Date | Signature of attorney/plaintiff |

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01   (6/17)   **SUMMONS AND COMPLAINT**    MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

## STATE OF MICHIGAN
## IN THE 29th CIRCUIT COURT
## FOR THE COUNTY OF CLINTON

JOHN THOMAS MILLER, and
BG & M, INC.,                                         Case No.: 15-661-GC
     Plaintiffs,

v.                                                   Hon.: RANDY L. TAHVONEN

DENNIS DUCHENE II, ANN DUCHENE,
DAVID BRIGGS, JAMAL DAOUD, JEFF GIBSON,
JAY MESSNER, DOUG SUMNER, CHIP NEILSON,
CATALYST HOLDINGS, LLC,
INSPIRED BUSINESS DEVELOPMENT LLC,
INSPIRED MARKETING, LLC,
     Defendants.

---

Collin H. Nyeholt (P74132)            Charles R. Cuzydlo (P48503)
FIXEL & NYEHOLT, PLLC                 CUZYDLO LAW GROUP, PLLC
4084 Okemos Road, Suite B            2193 Association Drive, Suite 500
Okemos, MI 48864                     Okemos, MI 48864
(517) 332-3390                       (517) 853-3962

---

## <u>SECOND AMENDED COMPLAINT and JURY DEMAND</u>

1

## STATEMENT OF THE CASE

Inspired Green is a purported 10 Million dollar corporation formed in 2009. In response to mounting financial pressures, the owners and managers of the "Inspired Green" organization began operating the company like a criminal enterprise in or about 2012. At this time, the company sought to cure its financial woes by borrowing sums of money from "investors" and private lenders and by selling "market segments" to "franchisees." In order to get these individuals to give their money to "Inspired Green" the Defendants engaged in an organized scheme of false representations as to the organization's past profitability and current financial status. The defendants together organized, ratified, and approved an Enron-esque financial transaction that was designed to conceal significant liabilities the organization had in order to secure their investment. This pattern of conduct is properly the subject of a claim under the RICO Act, 18 U.S.C. § 1962 *et seq,* because the Defendants used electronic communication and the United States mail in furtherance of this scam and to transmit this false information in violation of 18 U.S.C. §§ 1341 and 1343. And, the participants in the scheme transferred funds taken through this scheme and artifice to defraud across state lines in violation of 18 U.S.C. § 2314. Plaintiff, one of the victims of this scam, seeks threefold damages for his losses and attorney's fees pursuant to 18 U.S.C. §§ 1962 and 1962(d).

The claim was originally filed in 65A District Court between Plaintiffs and Defendants Dennis Duchene, Inspired Business Development, LLC, and Inspired Marketing, LLC proceeding on portions of the same transaction or occurrence as alleged in the Complaint, but proceeding on theories of violation of Michigan law. Defendants Ann Duchene, Catalyst Holdings, LLC, and John Does were *not* parties to this suit. On January 11, 2016 Hon. Clarizio

GRANTED Plaintiffs' motion to amend to state RICO claims and to transfer venue to the Circuit Court.

## JURISDICTION and VENUE

1.     This claim stems from a series of financial transactions involving an Enterprise known as "Inspired Green" that was located primarily in Eagle, Michigan.  Defendants courted a financial investment from Plaintiff Miller, and others, while one or both individuals were located in Clinton County, Michigan.  Defendant Duchene met with Plaintiff Miller personally within Clinton County at various times and made false representations to cause Plaintiff to invest monies in his organization.  Further, Duchene transmitted emails and text messages to Plaintiff Miller containing false information in furtherance of his scheme from within the County of Clinton.

2.     Plaintiff JOHN THOMAS MILLER is a Michigan individual who lives in Mason, MI.

3.     Plaintiff BG & M, INC. is a corporation owned by Plaintiff John Thomas Miller.  The registered office of the corporation is in Mason, MI.

4.     Defendant DENNIS DUCHENE II ("Defendant Duchene") is a Michigan individual.  He maintains a permanent residence in Eagle, MI which is within Clinton County.

5.     Defendant ANN DUCHENE is a Michigan individual, and the spouse of Defendant Dennis Duchene.  She maintains a permanent residence in Eagle, MI which is within Clinton County.

6.     Defendants DAVID BRIGGS, JAMAL DAOUD, JEFF GIBSON, JAY MESSNER, DOUG SUMNER, and CHIP NEILSON are the members of a certain "Board of Advisors" organized by persons who had lent money to the "Inspired Green" organization, and Defendant Inspired Marketing, prior to 2013.  These individuals approved and ratified Defendant Duchene's

decision to engage in a fraudulent financial transaction to hide significant debts of the Inspired Green organization in order to falsely represent the financial status of the organization to secure funds from third parties, including the Plaintiff to this matter, so that they could receive the proceeds from this fraud. Defendants alone are currently in possession of the names of these individuals and Plaintiff will amend the Complaint to name them once discovery reveals their identities.

7.    Defendant INSPIRED MARKETING, LLC is a limited liability company organized under the law of the State of Michigan by Defendant Dennis Duchene, with principal place of operations within Clinton County, Michigan. At times, this business entity has done business under the name "Inspired Green."

8.    Defendant INSPIRED BUSINESS DEVELOPMENT, LLC is a limited liability company organized under the law of the State of Michigan by defendant Dennis Duchene, with principal place of operations within the Clinton County, Michigan. At times, this business entity has done business under the name "Inspired Green."

9.    Defendant CATALYST HOLDINGS, LLC is a limited liability company organized under the law of the State of Michigan by Defendant Ann Duchene, with principal place of operations within the County of Clinton.

10.    The Court may exercise *general in personem* jurisdiction over Defendants, and each of them, because of their systematic and continuous direction of business activities into Clinton County and permanent residence and business presence herein. In the alternative, the Court may exercise *specific* jurisdiction over the claim because it resulted from a series of transactions and occurrences in this judicial district, related to Defendants' knowing direction of activities into

this district, the damages from which were felt, and would reasonably be expected to be felt, within this district.

11.    The Courts of Clinton County are the proper venue for this claim, pursuant to MCL 600.1621(a) because at the time of the events complained of herein the defendants resided, had a place of business, conducted business, and had a registered office here.  In addition, venue is proper as to the RICO claims, pursuant to 18 USC § 1965(a), because the Defendants transact their affairs in Clinton County.

12.    The Court may exercise *subject matter jurisdiction* over the claims brought pursuant to the federal RICO Act, 18 USC § 1962(c) and (d), pursuant to *Tafflin v. Levitt,* 493 US 455 (1990) (state courts have concurrent jurisdiction over RICO claims.)


## COMMON ALLEGATIONS

13.    Plaintiff repeats and re-alleges the factual statements and legal assertions contained in the previous numbered paragraphs as if fully restated herein.


### The "Inspired Green" Enterprise

14.    Defendant Dennis Duchene is the owner, organizer, and principal controlling agent of the "Inspired Green" organization.

15.    "Inspired Green" is the trade name used for a cluster of related business entities owned, operated, or at least controlled and substantially influenced by Defendant Dennis Duchene with the aid and support of Defendant Ann Duchene and others.

16.     "Inspired Green" attempts to derive revenue from selling energy efficiency upgrades, referred to as "retrofits," to homes and from various other activities under the trade name "Inspired Green."

17.     Between 2012 and 2014, Duchene and "Inspired Green" began experiencing financial problems.  The organization sought to cure its financial woes by seeking money from private parties either as short term loans or as purchasers of "franchises" or "market zones" in the organization.

18.     As of 2012, "Inspired Green" was operated through a holding company, Defendant Inspired Marketing, LLC.

19.     Defendant Dennis Duchene drafted a document entitled the "2015 Year End Update" which described Inspired Green's history and financial problems.  It is believed that the report was sent to investors, lenders and creditors.  It contains explicit admissions of devious schemes by Duchene as an explanation for non-repayment of loans and non-distributions.  This document is attached hereto as **Exhibit K** and referred to extensively herein.

20.     As Duchene would later state in a document entitled "2015 Year End Update"

> [i]n 2012, Inspired Marketing, LLC booked approximately $6.5MM in revenue, but incurred approximately $2.5MM in debt comprised of a combination of private lender liabilities ($2 MM+/-), State of Michigan tax liability (originally $140K +/-), Federal tax liability (originally $400k +/-), and liabilities of two major vendors (Sears/Service Concepts.) **Ex. K** at p. 1.

21.     During 2013, as Duchene stated in the "2015 Year End Update," "[o]ur staff shrank from as high as 200 in 2012 to 30 or so in 2013" and "operated at a $150k +/- loss." *Id.*

22.     Inspired Green was financed significantly by private lenders.  As Duchene stated, "[a] Board of Advisors was convened from among the private lenders" during 2013.  The members of

this Board of Advisors have been identified during discovery as Defendants DAVID BRIGGS, JAMAL DAOUD, JEFF GIBSON, JAY MESSNER, DOUG SUMNER, and CHIP NEILSON.

23.    Duchene desired to correct the company's cash flow problems and financial woes by borrowing money.  However, disclosure of the significant debts on the company's balance sheet prevented him from doing so.

24.    Duchene wrote that, as of 2013 *"[o]ur balance sheet made it impossible to attract new funds in the form of properly structured financing or investments."  Id.*

25.    During 2013, Defendants Dennis Duchene and Ann Duchene refinanced the home they owned jointly in Eagle, MI.  After the transaction, Defendant Ann Duchene's name was on the home but Defendant Dennis Duchene's was not.  It is believed, and herein alleged, that this financial maneuver was undertaken to frustrate creditor claims against the home based on Defendant Dennis Duchene's actions.  It is further alleged that Ann Duchene knew, at the time she acquiesced in this transaction, that doing so was designed to protect this asset from creditor claims against Dennis Duchene.

26.    Further, Defendant Dennis Duchene could now embellish the worth of his home when befriending potential lenders as he did with Plaintiff, and, when borrowing money from them, promise in writing to "stand as personal guarantor of loans made by his company", and that his "personal assets could be claimed in the event of non-payment" because he now hid his most valuable personal asset – his home - with the refinancing maneuver.

27.    As Duchene wrote, things continued to get worse for the organization financially.  As of the second quarter of 2014, April – June of 2014, "Inspired Marketing was being pressured by its two largest vendors, as well as two insurance company law suits and a law suit from a private lender, to the point that we had no operational cash flow slack."  *Id.*

28.     In response to these mounting pressures, Defendant Dennis Duchene concocted a plan to get people to invest more monies in "Inspired Green:" a complicated financial transaction designed to conceal the negative items on the organization's balance sheet.

29.     Duchene described his thought process behind this transaction in the 2015 Year End Update, saying

> I proposed a new business structure to the Board of Advisors that involved Inspired Business Development, LLC, a company that I formed in mid-2012 to launch training and licensing services, purchasing the assets and good will of the Inspired Green brand from Inspired Marketing for a fixed price of $500,000, which we determined to be fair market value, with $200,000 of this due in the first 12 months of IBD's operations. This move would allow us to stop operations under Inspired Marketing while giving creditors and tax agencies a clear plan for repayment of their claims up to the fair market value of Inspired Marketing's assets. ***This move would also allow a new company to build an unrestricted positive balance sheet, allowing for new funding sources and opportunities.*** *Id.* at p.2.

30.     This proposed business structure was ratified and approved by the Board of Advisors.

31.     Under the terms of this agreement, the tax liens and lender debt would not show on balance sheets that would be presented to lenders and other funding sources. Nor would they show up on the Financial statements filed with the Federal Trade Commission in Defendant's franchise disclosure documents.

32.     Further, in the new "clean" balance sheet and related documents, Defendants would claim there were no pending lawsuits against Inspired Business Development because those lawsuits that were filed were filed against Inspired Marketing.

33.     Despite the supposedly "clean" and "unrestricted" balance sheet that Duchene would present to investors and market zone purchasers, Inspired Business Development would remain obligated to pay Inspired Marketing in order to service the existing debt.

8

34.     Defendants DAVID BRIGGS, JAMAL DAOUD, JEFF GIBSON, JAY MESSNER, DOUG SUMNER, and CHIP NEILSON, the members of the Board of Advisors, became equity owners in Inspired Business Development.  Therefore, they stood to personally gain from the proceeds of moneys entrusted to Inspired Green through the false representations and material omissions they approved and ratified Duchene to make.

35.     In July of 2014, Inspired Business Development began selling licenses to persons interested in operating under the Inspired Green name.  *Id.* at p. 3.  As Duchene would later write, "*[t]he clean balance sheet of IBD allowed for discussions with many individuals who were interested in investing or partnering with a new franchise concept.*"  *Id.*

36.     Duchene continued to pass money from Defendants Inspired Business Development and Inspired Marketing, and paid this towards the debts of the organization.

37.     It bears noting that this sort of behavior -using affiliated business entities to hide debt and skew the financial picture of a business organization- was one of the tactics that Enron used heavily right before the financial scandal that cost its investors billions of dollars.  It also bears noting that this sort of dishonest conduct was one of the things that the Sarbanes Oxley Act of 2002 was designed to prevent.

38.     As shall be described herein, Plaintiff John Thomas Miller was one of these "new funding sources" that Duchene was now able to target because he had concealed the tax debt and other debt through this financial restructuring.

39.     In or about the last quarter of 2014 the Mark Group, one of Inspired Green's larger business affiliates, abruptly folded.  This resulted in a significant drop in revenue to Inspired Green.  The negative information would have been reflected on the new "clean" balance sheet.  However, the half million in tax debt, and other lawsuits, remained hidden.

40.     As Duchene later wrote, "[t]he sudden, unpredictable loss of Mark Group resulted in a significant cash flow blow to the company.  More than $120k was paid to Inspired Marketing over this period of time to keep creditors in the right mind frame, forcing Inspired Business Development to operate as though it had a cash loss of -$123k."

41.     Duchene responded to this "sudden, unpredictable loss" of revenues by further targeting individuals like Miller to "invest" in the rights to participate in Inspired Green's business.

42.     As Duchene later wrote,

> Mark Group's sudden departure left a big cash flow hole, amounting to more than $330k in owed franchise licensing fees and projected revenue share of approximately $60k per month from operations already being supported by the licensed system. *I decided the best way to overcome this major setback was to seek individuals or entities who would be interested in investing in start-up versions of the franchise that would benefit from the licensing fees already paid by Mark Group. Id.* at p. 4.

43.     Again, the Defendants' practice of concealing the organization's debt and negative financial position allowed Duchene to approach these individuals, *without* disclosing the significant financial problems the organization had.

44.     "Inspired Green" recruited Abby Feinstein, a former employee of the Mark Group, as the Director of Operations for Defendant Inspired Business Development.  Feinstein's job, that she operated from her residence or office in Pennsylvania, included recruiting individuals to invest in these "market zones."  During this period of time, she found more than 10 individuals who purchased "market zones" in this arrangement.

45.     On June 20th, 2014 Defendant Ann Duchene organized Defendant Catalyst Holdings, LLC.  **Ex. N.**  Defendant Dennis Duchene replaced her as the Resident Agent in or about February of 2015.  At times material hereto, Inspired Green represented to investors that Catalyst Holding LLC was an independent business entity in order to influence their decisions.

10

46.     Defendants published Catalyst Holdings LLC's website provides, as of 4/11/16, that "Catalyst has partnered with Inspired Green (www.goinspiredgreen.com) to develop an opportunity for ordinary individuals to invest as silent partners in the expansion of proven service business." **(Ex. L.,** http://catalystholdingsllc.com/opportunities, accessed 4/11/2016.)

47.     Duchene will likely continue to target investors and market zone purchasers to invest money in this scheme. In the "2015 Year End Update" Defendant Dennis Duchene provided a "Summary of 2016 Goals." One of his stated goals was to "secure 3rd party financing to restructure $170,000 in debt and past due taxes for the purposes of being able to run without these constant massive cash flow hemorrhages." **Ex. K,** at p. 7.

*Defendants Target Plaintiff John Thomas Miller*

48.     As the following shall demonstrate, Plaintiff Miller was one of the "new fund sources and opportunities" that Defendant Duchene targeted after restructuring the organization's balance sheet to hide its substantial debt during the second quarter of 2014. And, he was one of the individuals that Defendant Duchene targeted to purchase a "franchise" in the second quarter of 2014. In order to get his money under this scheme, Duchene directed a pattern of false representations and lies of omission to Miller and he ended up losing money as a result. At no time did Duchene apprise Miller that his investment was sought in order to refinance significant, concealed debt of the organization. And, at no time did Duchene apprise Miller that his organization was in deep financial trouble.

49.     Plaintiff John Thomas Miller was introduced to Defendant Dennis Duchene by his son, JR Miller ("JR"), in or about May of 2014. JR was, at this point in time, involved in an employment relationship with Defendant Duchene.

11

50.     In May, 2014 Defendant Duchene asked Plaintiff Miller to make a "short-term loan" to him. Duchene claimed that this loan was secured by a certain invoice from another company for payments related to a certain market segment, and told Plaintiff that he would be repaid according to the terms of the short term loan agreement.

51.     Duchene, throughout his conversations with Plaintiff, used high numbers such as "10,000 customers in the Lansing area" and "over 100,000 customers nationwide" in addition to other impressive –and contrived- statistics.

52.     Duchene *failed* to mention to Miller that, in 2013, "[o]ur staff shrank from as high as 200 in 2012 to 30 or so in 2013" or that "[t]he company's cash flow was under immense strain due to the need to service tax liabilities, contractor and vendor liabilities, and the fact that $400,000 in invoiced work was not able to be collected." **Ex. K,** D. Duchene 2015 Year End Update at p.1.

53.     Duchene also *failed* to mention to Miller that, as of January to March of 2014, the company "entered the first quarter of 2014 with a radically reduced staff of 8 individuals" and that "Cash flow continued to be highly constricted, slowing the growth rate and profitability of the business." *Id.* at p. 2.

54.     Duchene, it can reasonably be inferred, intended that Plaintiff Miller should rely upon these misstatements and material omissions in deciding whether to make a short term loan to the Inspired Green organization.

55.     Plaintiff Miller did, in fact, rely on Duchene's representations as to his sales and personal wealth in deciding to make various loans to him, and to later purchase a "market segment" as a "franchisee."

12

56.     If Duchene had mentioned the debt that was being hidden in the transaction between Inspired Marketing and Inspired Business Development, Plaintiff Miller never would have invested a cent with him.

57.     Despite the significant, concealed financial difficulties of his organization, Duchene agreed to repay the $15,000 Short-term loan from Miller by June 12, 2014.  He did so early, in order to gain Miller's trust.

58.     On June 4, 2014, 8 days early, Duchene repaid the loan, with $1,125 interest, to Miller. Duchene also emailed him at this time and asked "are you interested in rotating around $10k of the funds to another note?"  Miller responded "yes, I'm interested."

59.     Plaintiff Miller, relying upon Duchene's misrepresentations, wrote another check to Duchene for $10,000 for another "short term note" on June 10, 2014.

60.     On July 7, 2014 Duchene emailed Miller and asked him to "roll" the loan into another short term note, stating "we just got payment for the current outstanding note.  Do you want to roll the $10k over again against new invoices?"

61.     On July 8, 2014, JR emailed Plaintiff Miller (at the request of Defendant Dennis Duchene) and asked him to meet him and Duchene in order to discuss "entrepreneurial ideas." Plaintiff agreed to the meeting.  During this meeting, Duchene attempted to sell Plaintiff Miller an interest in one of the "Inspired Green" "market zones."

62.     During this July 9, 2014 meeting, Dennis Duchene made a series of representations to Miller to encourage him to purchase the "market zone."  He described the Inspired Green marketing process, and made representations as to the historical performance of Inspired Green market zones and revenues derived by Inspired Green licensees.

63.     Upon information and belief, given the facts and circumstances described herein, it is believed that the representations Duchene made as to the historical profit and performance of Inspired Green marketing zones were false, and knowingly false when made.

64.     Duchene intended that Miller should rely upon the representations he made as to the Inspired Green performance history in deciding whether to continue to extend "short term loans" to the business, and to purchase a "market zone" as a "licensee" or "franchisee."

65.     On July 9, 2014, Duchene represented to Plaintiff that a third-party called Great Lakes Energy Services would provide sales leads for the Columbus market zone.  Duchene represented that Great Lakes Energy Services was a separate "nonprofit partner" to Inspired Green, and a separate and distinct legal entity from the Inspired Green organization.   It was Duchene's intention that Plaintiff would rely upon this assertion that Inspired Green had "partnered" with an independent organization to provide sales leads in evaluating the viability of the proposal for the Columbus marketing zone and in deciding to invest money in Inspired Green.

66.     With respect to this supposedly independent, third-party "non-profit partner," it was later learned that "Home Performance Advocacy Group" was a dba filed June 5, 2014 for Great Lakes Energy Services and it's Director was Dennis Duchene.  Still later, on January 15, 2016, another dba and amended Articles of Organization was filed for Great Lakes Energy Services by Ann Duchene, who signed the amendment and became its Resident Agent.

67.     On July 9, 2014 Miller expressed skepticism in Defendant Duchene's business offering. Duchene responded "skepticism is good.  Don't just take my word for it, look at the evidence" and referred Miller to a document he had prepared describing the "Powered by Inspired Green Home Performance Closed Loop Process."

14

68.     Defendant Duchene continued to court Plaintiff's purchase of a "market zone" On July 10, 2014 Defendant Duchene emailed Plaintiff Miller a series of documents pertaining to the proposed business arrangement with Inspired Green. The franchise offering took place prior to Defendant filing Franchisor papers and registering with the State of Michigan. **Ex. B.** The email included a .pdf document entitled "Agreement to License – operator," another .pdf document entitled "Powered by Inspired Green – Owner-Operator," and an Excel spreadsheet entitled "HP licensing model GZI – operator-single pod." *Id,* **Ex. C-E.**

69.     Duchene intended that Miller would review, and rely on the statements contained therein, in deciding whether to buy a "market zone" from Inspired Green.

70.     Upon information and reasonable belief, Plaintiff Miller was not the only prospective "licensee," "franchisee" or "market zone" purchaser to whom Duchene sent the above documents.

71.     It is reasonably inferred, and herein alleged, that it was Defendants' regular practice to mail or email one or all of the above referenced documents to prospective "licensees," "franchisees" or "market zone" purchasers as an attempt to encourage persons to complete the purchase from Inspired Green.

72.     It is believed, given the foregoing, that some or all of the documents identified as Exhibits C-E were either prepared, or reviewed and ratified, by Abby Feinstein in the course and scope of her duties to Inspired Green as promotional materials for "investors / franchisees" to whom she was selling franchises/"market zones."

73.     Upon information and reasonable belief, Defendants have mailed or emailed one or all of the documents identified and discussed in the previous paragraphs to at least one other person

15

who Defendants wanted to purchase a "market zone," "license agreement," or "franchise" from the "Inspired Green" system.

74.     As shall be demonstrated presently, the documents contained in **Exhibits C-E** contain misstatements of fact as to the historical "average" performance of the Inspired Green system. And, they contain false promises as to the process by which Inspired Green initiates operations in a "market zone" upon sale to a "licensee" or "franchisee."

75.     The "Powered by Inspired Green – Owner-Operator" document that Duchene emailed on July 10th was a pre-printed brochure with graphics and other information that contained various representations about the "Inspired Green" process. **Ex. C.** The document promised and represented that

  a. "Inspired Green will launch a non-profit lead generation and home performance audit program in your exclusive market segment. What this means is that our non-profit partner will find the clients, sell them a home performance audit, provide the audit, and sell your company the Scope of Work for retrofit." *Id.* at p. 2.

  b. "Our typical conversion rate from audit to sold retrofit project is 65% over the last 3,000 appointments." *Id.*

  c. "A fully functioning market segment produces 15-20 retrofit SOW's on a weekly basis. You never have to conduct audit test in or out, nor do you have to wonder what your lead pipeline will look like." *Id.*

  d. "[Y]our company is assigned a Project Specialist, who serves as your team's Program Administrator and your home performance client's single point of contact from retrofit sale through the completion of their project." *Id.*

  e. "The Project Specialist manages all of the project data in our proprietary home performance data base. You can request reports on any aspect of your sales or project performance without EVER having to enter or maintain the details. Your consultants simply email, call, or text updates to the Project Specialist and the rest takes care of itself. 100% of your relationship with the client is summarized in a single spot and things no longer fall through the cracks." *Id.*

76.     Duchene verbally represented, at times, that the "non-profit partner" referred to in this documentation was a third-party business organization GLES, short for Great Lakes Energy Services, that would provide leads in given geographical areas.  It was Duchene's intent that a potential "licensee," "franchisee" or "market zone" purchaser would rely upon their belief that a third-party organization was involved in the lead generation in evaluating the profit potential of the business system.  The third party organization is in writing in the brochure, called the non-profit partner.

77.     With respect to the compensation and profitability of becoming a "licensee" of Inspired Green, the "Powered by Inspired Green" document also represented that the Net Profit for the business was 15.32%, and that "Owner compensation" for "12 Full Strength Months, Single Pod" would be "$85,472.47" and for "12 Full Strength Months, Full Market Zone" would be "$399,000.00." *Id.* at p. 4.

78.     In light of the significant financial losses and liabilities the organization incurred between 2012 and 2014, these statements as to its historical profitability were false and misleading.

79.     The "Agreement to License" that Duchene emailed Plaintiff on July 10, 2014 mirrored "Powered by Inspired Green's" representation that Inspired Green's "nonprofit partner" could, and would, provide regular referral business. Paragraph 2.K of that document provided that "[l]icensor [Inspired Green and Affiliates] will maintain a minimum first year sales rate of not less than $250,000 as generated by its management of the client acquisition process on behalf of the licensee [in this case, Miller]." **Ex. D.**  It bears noting that this language was absent from the Agreement that Miller eventually signed.

17

80.     The Excel Spreadsheet Duchene emailed Miller on July 10, 2014, "HP licensing model GZI – operator-single pod" (**Ex. E**) contained various projections of income for the proposed "market zone."

81.     Duchene later represented to Miller that the financial projections were based on historical data from "34 different franchises" he had across the nation.

82.     It was Duchene's intent that a potential "licensee," "franchisee" or purchaser of a "market zone" such as Miller would rely on these statements and believe that others who had entered into similar business arrangements with Inspired Green had realized similar profits and results from their involvement in the organization.

83.     In addition, the Excel Spreadsheet contained information about the "actions" that Duchene, Inspired Green, and the "licensee" would take to get the purchased "market zone" up and running in the weeks after "deployment." **Ex. E.** The document provided that, in the sixth "Deployment Week," after the actions Inspired Green and its affiliates would take with the "licensee," "[f]ull strength performance [would be] achieved." *Id.*

84.     It was Duchene's intention that a potential "licensee," "franchisee," or "market zone" purchaser, such as Plaintiff, would rely upon the statements in the Excel Spreadsheet as a promise for the steps he and Inspired Green would take to get the "market zone" running after entering into the agreement with Inspired Green.

85.     On July 14, 2014, relying on Duchene's misrepresentations, Plaintiff Miller once again "rolled over" the short term loan he had made to Duchene. Defendant Duchene emailed Plaintiff Miller paperwork on the new $10,000 loan "rollover." The new loan was to be due and payable on August 9, 2014.

86.     During a July 16, 2014 conversation, Defendant Duchene implied that he was wealthy and that his business was thriving.  Duchene told Miller that his companies were "doing great" with "$6 million in sales and half a million in receivables" or words to that effect.  Duchene told Plaintiff that he "lived in a $400,000 home on 20 acres in Eagle, Michigan" or words to that effect.  He further stated that he could "personally repay the short term loans if he had to" and offered to "personally guarantee it in writing," or words to that effect.  The loan documents Miller eventually signed, in fact, indicated that Duchene had personally guaranteed the loan with his personal assets, leading Plaintiff to believe Duchene was putting his home on the line.

87.     At the time he made these representations to Plaintiff, Duchene was in no position to "personally guarantee" anything.   At this point in time, Inspired Marketing LLC had approximately $540,000 in back federal and state taxes for which Inspired Business Development, LLC was responsible. **Ex. K.** Defendant Duchene also had an October 14, 2009 judgment of $20,546 against him by McCardel Restoration, LLC which, as of his conversation with Miller, remained unpaid. **Ex. A.**

88.     Defendant Duchene, in fact, did not even have his name on the title to the "$400,000 home in Eagle" because on or about October of 2013 he had refinanced and placed the home in the name of his wife, Defendant Ann Duchene, presumably to avoid creditor claims on this asset. *Id.*

89.     It is believed, and herein alleged, that at least one dollar of the funds that Duchene received from the "Inspired Green" enterprise, after Plaintiff Miller's investment, were used to pay the mortgage on this home after the October 2013 transfer of title to Defendant Ann Duchene.

90.     For the reasons stated previously, Defendant Duchene's representations as to his personal wealth, and creditworthiness, were demonstrably false.

91.     On July 16, 2014 Defendant Duchene Emailed Plaintiff Miller a pie chart he had prepared that, he claimed, represented "average project pricing and profitability" of energy upgrades sold through the Inspired Green system. **Ex. F.** The document claimed that the "average sale" for IBD projects was $5,376 and further asserted that, on average, each sale generated profit to Inspired Green's licensees. *Id.*

92.     It was, upon reasonable inference and belief, Defendant Duchene's intention that Miller should rely upon the statements made in this graphic as to the "average project pricing and profitability" of his other projects in deciding whether to enter into the proposed business relationship with Inspired Green.

93.     Again, given the significant financial trouble that had befallen the Inspired Green organization in 2012, it is highly dubious that they received "profit" on their average sales.

94.     Duchene represented to Miller, at times, that this average was based on "thousands of sales" by his various "licensees" or "franchisees" in his various "market zones.

95.     Upon information and reasonable belief, it was Defendant Duchene's intention that Miller should rely upon the statements contained in the July 16, 2014 email discussed above, and the attachments thereto, in deciding whether to purchase a "market zone" from Defendant Duchene.

96.     On July 28, 2014 Plaintiff Miller emailed Defendant Duchene a Microsoft Word document that contained a written description of his understanding of the Inspired Green Process.

97.     On the same day, Defendant Duchene emailed Miller back with a "track changes" version

of the document that contained "corrections."  **Ex. G.**  Duchene made a series of representations

to Miller about how the Inspired Green "system" would work within the document he emailed on

July 28:

> a.  "IBD assigns a Project Manager, an IBD employee, who oversees all systems and accountability for the franchise." *Id.* at 2nd Page.
>
> b.  "Inspired Business Development (IBD) assigns a Project Specialist, an IBD employee who trains the Franchisee and manages all relationships from start to finish after an appointment is confirmed for presentation, including all communications with homeowners and sub-contractors." *Id.*
>
> c.  "The goal is to have 1 "pods" in action within 6 weeks and 3 pods in action within 12 weeks." *Id.*
>
> d.  "IBD trains the Marketing Reps." *Id.*

98.     Defendant Duchene also made a series of representations to Plaintiff Miller about the

historical profitability and performance of Inspired Green franchises similar to the one he was

trying to sell him in the July 28 email.  He stated:

> a.  "34% of homeowners who have historically experienced the free visual inspection agreed to purchase a test.  This is true over the last 10,000+ appointments.  IBD trains these Consultants.   An auditor, employed by the non-profit partner, performs the test." *Id.*
>
> b.  "72% of those tested have historically agreed to have work done.  The average sale is historically approximately $5,000." *Id.*

99.     Defendant Duchene, it can reasonably be concluded, intended that Plaintiff Miller would

rely upon the statements contained in the July 28 email, and the attached Microsoft Word

document therein, in deciding whether to purchase a "license" or "franchise" in the "Inspired

Green" "system."

100.    On July 29, Miller emailed Duchene and said "I have decided against further pursuing the

licensing/franchising opportunity."

21

101.   On July 30, 2014, and again relying upon Duchene's representations as to his personal financial viability and the historical performance and financial standing of Inspired Green, Plaintiff wrote Dennis Duchene another check for $8,000 as a "short term loan." The loan was transacted at Starbucks in Okemos. Duchene asked Plaintiff if he would "do a favor" and review an electronic document he would later email. Plaintiff agreed. Defendant emailed Plaintiff a first draft partial of the Franchise Disclosure Document, and when later questioned about providing Plaintiff with the FDD as required by law, Defendant claimed Plaintiff helped draft the document.

102.   On August 1, 2014, JR presented a new proposal to Plaintiff Miller on Defendant Duchene's behalf. JR met Plaintiff at a restaurant for lunch. JR stated that Duchene was interested in offering him a 70/30 partnership in the Columbus, OH "market zone" with former Inspired Green "super salesman" Brendan Kent. Afterwards, Plaintiff called Duchene and Duchene said he would arrange for a meeting between himself, JR, and Kent. Duchene utilized several emails to arrange the meeting and make the offer to Kent. **Ex. H.**

103.   Upon information and belief, Duchene had already targeted Kent with a concept of partnering with Duchene himself, and now targeted and courted him to travel from Columbus, Ohio to Grand Ledge so he could make the franchise offer and get Kent to invest his money in defendant's scheme. Upon information and belief, Kent was presented the same or similar printed materials as Plaintiff by Defendants.

104.   On August 5, 2014 Plaintiff met JR, Kent, and Defendant Duchene for lunch in Grand Ledge, MI. During this meeting, Duchene told Plaintiff and Kent that he had "34 Market Zone Owners in New York, New Jersey, and Pennsylvania and they are all doing very well" or words to that effect. He also reiterated the information that he had already provided Plaintiff as to the

profitability of the Inspired Green "system," past performance of other "licensees / franchisees," and the system of implementation to get the "market zone" up and running.

105.    Duchene, in fact, did not have 34 franchisees at this point in time, nor did he ever. However, he intended that Plaintiff rely upon this false statement in evaluating whether to invest money into the "franchise" system.

106.    In the Franchise Disclosure Document filed with the Federal Trade Commission, Duchene listed only 23 Franchisees. But, most of those have a launch date AFTER the statement he made about "34 franchisees" to Plaintiff.

107.    On August 11, 2014, Plaintiff texted Duchene to inform him that Brendan Kent had turned down the proposed arrangement for Inspired Green – Columbus. **Ex. I.**

108.    After Kent backed out from the deal, Duchene continued to press Miller to enter into an agreement and requested a "go-no go" meeting for August 25, 2014.  This time, the proposal included Duchene as a partner with Plaintiff and his son for Inspired Green's Columbus "market zone." He told him "I'll launch the LLC and with my name on it failure is not an option." "I'm a type A hands-on control freak and we'll be up and running in no time." Duchene promised to provide 40 hours of training in order for Plaintiff to learn to oversee accounting, insurance, and compliance.  He told Miller he had "already hired four people in Columbus."  He promised to hire an attorney in Columbus to act as the registered agent for the new entity.  Duchene promised he would put $10,000 of his own money into the company for launch funds.

109.    On August 25, 2014 Duchene reminded Miller that he is "deeply religious" and identified himself as a "man of God."  He claimed that his company had donated the funds for the Riverview Church expansion, implying that Inspired Green paid the bill for the expansion.

23

110.    On September 8, 2014, and in reliance upon the false representations Duchene had made previously, Plaintiff signed an operating agreement with JR Miller and Defendant Dennis Duchene for Inspired Green Columbus, LLC.  Miller signed on behalf of BG & M, Inc.  **Ex. J.**

111.    It was agreed that Plaintiff would allow Duchene to "roll" the $18,000 in unpaid "short term loans" as his capital contribution to the LLC, together with an additional $2,000 he would pay at a later date.

112.    On September 16, 2014 Plaintiff wrote another check to Dennis Duchene of $2,000 for "IGC Op Agrmt. Final Contr."  This, together with $18,000 in "short term loans," was credited towards his capital contribution in Inspired Green Columbus.

113.    On September 17, 2014 Plaintiff wrote another check to Dennis Duchene for $10,000 as a "short term loan."  This was, as before, due in 30 days.  This time, however, Duchene failed to timely honor his payment obligations.

114.    At no time did Duchene tell Plaintiff that the $18,000 in funds he had invested had been transferred to Inspired Marketing in order to service the significant trailing tax debt of the organization.

115.    Duchene, contrary to his representations to Plaintiff, did not take the steps he had promised to get the Columbus "market zone" up and running as promised.  *See Ex. E.*

116.    Duchene failed to contribute the $10,000 in launch funds, as promised to Plaintiff.

117.    He failed to retain a resident agent in Ohio, but repeatedly represented to Plaintiff that he had done so.

118.    Defendant Ann Duchene delayed the startup of Inspired Green, Columbus, LLC by taking it upon herself and deciding not to file the IGC, LLC corporate papers with the State of Ohio.

119.    Duchene later declared himself a "non-active partner" in Columbus and failed and refused to take the "hands-on" actions he had promised.

120.    Months later, the project languished and Plaintiff saw no revenue or operations from the new venture.

121.    In December of 2014, now the 12th "deployment week," Plaintiff confronted Defendant Duchene with his various false representations.  Duchene responded by cutting off all contact with Plaintiff.

122.    On January 21, 2015, Defendant Duchene, via Plaintiff's son JR,   submitted an "offer" to Plaintiff to "buy" his interest in the Columbus "market zone."  **Ex. M.**  Duchene represented, at this time, that the offer was made by a "third-party" operating as Catalyst Holdings, LLC.  However, it was not a cash offer and Miller would have had to depend on the creditworthiness of the supposed third-party, Catalyst Holdings, LLC.

123.    Plaintiff, sensing that something was not right with the offer, declined the purchase.

124.    It was later learned that Catalyst Holdings, LLC was a Michigan LLC organized by Defendant Ann Duchene.  **Ex. N.**

125.    On reasonable inference, it is alleged that Defendants' false representation to Plaintiff that Defendant Catalyst Holdings, LLC was an independent third-party, was designed to cause Plaintiff to incorrectly evaluate the likelihood of receiving payment and rely on this belief in making a determination to accept the arrangement.

126.    Given Defendants' pattern and practice of organizing LLCs and then representing to investors that they are third-parties in order to inflate their economic expectations, it is believed that Defendants have made similar representations to other investors involving Defendant Catalyst Holdings, LLC.

127.    Upon information and belief, Defendant Ann Duchene was aware that Defendant Dennis Duchene misrepresented to Plaintiff and others similarly situated that Defendant Catalyst Holdings, LLC was an independent, third-party investor in order to cause him to accept the "sale" agreement for the market zone and avoid further litigation based on his false representations.

128.    On May 11, 2015 Plaintiffs, represented by different counsel, filed case number 15-661-GC in the 65A District Court in Clinton County, Michigan.  He alleged fraud (count I), violation of the Michigan Franchise Investment Act (count II), and sought rescission of the contract (count III).  The defendants to this action were Dennis Duchene, Inspired Business Development LLC, and Inspired Marketing LLC.  This action remains pending in the District Court, subject to the Court's order approving Plaintiffs' motion, through the undersigned, to amend and to transfer the claim to the Circuit Court.

**COUNT ONE: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 USC § 1962(C)**
*As against all Defendants*

129. Plaintiff repeats and re-alleges the factual matter and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

130. 18 USC § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

26

131. At all relevant times, the following nonexclusive list of individuals and business entities constituted an "enterprise," within the meaning of 18 USC §§ 1961(4) and 1962(c), in that they were "a group of individuals associated in fact":

    a.    Any and all individuals or business entities associated under the "Inspired Green" banner, whether named herein as Defendants or otherwise, and aware of and complicit in Defendants' pattern of false representations,

    b.    Defendant Dennis Duchene II,

    c.    Defendant Ann Duchene,

    d.    Defendants DAVID BRIGGS, JAMAL DAOUD, JEFF GIBSON, JAY MESSNER, DOUG SUMNER, and CHIP NEILSON, the members of a "Board of Advisors" of Defendant Inspired Marketing who approved and ratified a fraudulent financial transaction to hide debts of the organization in order to secure loans and investments from third parties including the Plaintiff,

    e.    Defendant Catalyst Holdings, LLC as a "person" within the meaning of 18 USC §§ 1961(3) and 1962(c), who associated with and/or participated in the conduct of said enterprise's affairs,

    f.    Defendant Inspired Business Development, LLC, as a "person" within the meaning of 18 USC §§ 1961(3) and 1962(c), who associated with and/or participated in the conduct of said enterprise's affairs,

    g.    Defendant Inspired Marketing, LLC, as a "person" within the meaning of 18 USC §§ 1961(3) and 1962(c), who associated with and/or participated in the conduct of said enterprise's affairs,

    h.    Such other managerial or executive level employees of the named Defendants, whose identities are in the sole possession and control of the Defendants, who proscribed, encouraged, facilitated, and otherwise aided the pattern of illicit conduct described herein.

132. The Defendants' pattern of racketeering activity consisted of:

    a.    A scheme to defraud potential and current "investors," "licensees," "franchisees," purchasers of "market zones," or other individuals interested in investing or entrusting money in the "Inspired Green" enterprise through a series of false statements and knowing concealments about the profitability and historical performance of the organization.

b. Defendant Dennis Duchene knowingly conceived and carried out a financial transaction that was designed to conceal the significant financial problems from potential investors, including the Plaintiff. Further, he regularly, and as his regular and habitual way conducting his business affairs, made false representations as to (1) his personal financial status, (2) "Inspired Green's" sales rate and success, and (3) historical revenues generated by similar individuals who had invested money with him, and (4) the involvement of supposed third-party business entities –that were really controlled by him, Defendant Ann Duchene, or his employees- in order to distort the view of the viability of the organization upon which their decisions to entrust money would be based.

c. Defendant Ann Duchene organized Defendant Catalyst Holdings, LLC and approved and ratified Defendant Duchene's decision to falsely represent to "investors," "franchisees" and "market zone" participants that it was an independent, third-party business entity in order to distort the view of the viability of the organization upon which their decisions to entrust money would be based. In addition, upon reasonable inference from the facts herein, she was aware of and approved and ratified Defendant Duchene's pattern of misrepresentations to "investors," "franchisees," and "market zone" purchasers. In addition, it is believed that she received and personally benefited from the proceeds of this scheme and artifice to defraud, most notably by receiving payments from Defendant Dennis Duchene to the house that was placed in her name.

d. Defendants DAVID BRIGGS, JAMAL DAOUD, JEFF GIBSON, JAY MESSNER, DOUG SUMNER, and CHIP NEILSON, the members of the Board of Advisors, approved and ratified Duchene's decision to falsely represent the financial status of the organization to third-parties in order to procure funds to the organization.

e. Defendants Catalyst Holdings, LLC, Inspired Business Development, LLC, Inspired Marketing, LLC, and likely other business organizations as yet unidentified, participated in the scheme and artifice to defraud by approving and ratifying the unlawful acts described herein, and by aiding in transmitting or transferring in interstate commerce money that is stolen, converted, and fraudulently taken as described herein.

f. Defendants, and others, placed or caused to be placed in a post office or authorized depository for mail, matter that furthered the scheme to defraud, in violation of 18 U.S.C. § 1341.

g. Defendants, and others, transmitted, or caused to be transmitted, by means of wire, telephonic, or internet communication in interstate and foreign commerce matter that furthered the scheme to defraud (including, but not limited to, the email and telephonic communications mentioned herein), in violation of 18 USC § 1343.

h. Defendants, and others, transmitted or transferred in interstate commerce money, knowing the same to have been stolen, converted, or taken by fraud, in violation of 18 USC § 2314.

133. At all relevant times, the enterprise described above was engaged in, and its activities affected, interstate commerce.

134. All of the predicate acts described above were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud persons similarly situated to Plaintiff Miller, or business entities such as Plaintiff BG&M, into entrusting money to the "Inspired Green" organization; their common result was to defraud plaintiffs or others similarly situated of property or money; the defendants, acting individually or through their agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs or others similarly situated were the victims of the fraudulent acts; and/or the acts were otherwise interrelated by distinguishing characteristics and were not isolated events.

135. All of the predicate acts described above were continuous so as to form a pattern of racketeering activity in that the pattern of racketeering activity described herein occurred continuously for a period of not less than two years.

136. As a direct result of, and by reason of, the activities of the defendants, and their conduct in violation of 18 U.S.C. §§ 1962(c), Plaintiffs have been injured in their business or property, within the meaning of 18 USC § 1964(c).

137. Plaintiff is, therefore, entitled to recover threefold the damages that he has sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

29

## COUNT TWO: CONSPIRACY TO VIOLATE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 USC § 1962(d)
### *As against all Defendants*

138. Plaintiffs restate and re-allege the factual statements and legal assertions contained in the previous numbered paragraphs as though fully restated herein.

139. The aforesaid Defendants conspired together and with other parties to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity (as described above) in violation of 18 USC § 1962(d).

140. Defendant Dennis Duchene made a series of false representations to potential investors, lenders, "franchisees," "market zone purchasers" and other individuals as to the historical profitability and current financial status of the "Inspired Green" organization in order to cause them to pay monies to the organization.

141. Defendants DAVID BRIGGS, JAMAL DAOUD, JEFF GIBSON, JAY MESSNER, DOUG SUMNER, and CHIP NEILSON, the members of the "Board of Advisors" approved and ratified Duchene's decision to misrepresent the financial status of the business in order to secure loans and sales of franchises to persons such as John Thomas Miller.

142. Defendant Ann Duchene organized a business entity, Catalyst Holdings, LLC, and allowed it to be used in furtherance of the scheme. Further, Defendant Ann Duchene assented to a financial transaction with Dennis Duchene wherein the family home was refinanced and his name was removed from the title, in order to avoid claims against this asset resulting from Duchene's misconduct. In addition, proceeds from this fraudulent enterprise, it is believed and herein alleged, were used to make payments on the home.

143.  As stated previously, as a direct and proximate result, and by reason of the activities of the defendants, and their conduct in violation of 18 USC § 1962(d), Plaintiff has been injured in his business or property, within the meaning of 18 USC § 1964(c).

144.  Plaintiff is, therefore, entitled to recover threefold the damages that he has sustained together with the cost of the suit, including reasonable attorneys' fees and experts' fees.

## COUNT THREE: MICHIGAN LAW FRAUD
### *As against all Defendants*

145.  Plaintiffs restate and re-allege the factual statements and legal assertions contained in the previous numbered paragraphs as though fully restated herein.

146.  For the period of time discussed in the Complaint, Defendant Dennis Duchene made a series of false representations to Plaintiff John Thomas Miller.  These included, but are not limited to,

    a.  That he had over 30 successful Inspired Green franchises operating in the United States,

    b.  That the Inspired Green system would guarantee a minimum of $250,000 worth of sales and that as an owner of such a franchise, such a business would have gross revenues of approximately $400,000 per year,

    c.  That upon Plaintiffs' becoming members of his Ohio limited liability company, Plaintiff Miller would have responsibility only for overseeing the company's accounting, insurance, and compliance needs,

    **d.**  That Defendants would contribute an initial $10,000 to get IGC up and running and to help cover initial operating and overhead costs, together with an additional $10,000 from JR Miller.  JR's contribution, it has been learned, was to be made

31

with monies owed to JR by Defendants.  Defendants never made this contribution either.

 e. That Defendants would have the new LLC "launched," up and running by October 2014, and that it had already hired people in Columbus,

 f. That Defendants would provide Plaintiffs with a project specialist,

 g. That Defendants had an independent, non-profit partner that would provide leads and set up appointments,

 h. That Defendants would do the above as a partner, for a 25% stake in the company,

 i. By this time Defendant had convinced investors, stakeholders and lenders of Inspired Marketing to move their interests over to Inspired Business Development with the promise that operations of Marketing would stop; that Marketing's only income would be from its sale to Development, and that those payments from Development would be used by Marketing to pay back taxes to the local, state and federal governments, and other critical creditors.  Duchene was now the sole owner of Marketing, and in spite of his aforementioned promise to his investors and lenders, he signed agreements with Plaintiff for Marketing to obtain 25% profits of a new company, Inspired Green Columbus, LLC.

147. Defendants failed to disclose certain material facts including that

 a. "Inspired Green" had accrued substantial debts, including more than $500,000 in unpaid taxes, through its operations for which, even though it was knowingly concealed on its balance sheet, it was still liable,

32

b. The funds that Plaintiff had paid to Defendants had been transferred to Inspired Marketing in order to service accrued and concealed debts,

c. Other franchisees were failing to come even close to the level of performance that it had represented in the materials submitted to Plaintiffs prior to his agreement to purchase,

d. It did not have the promised funds to pay towards initial start-up expenses due to its pronounced financial difficulties,

e. Plaintiff's son, and proposed partner JR Miller, had not been performing adequately under the Inspired Green System. Defendant was dissatisfied with JR's performance and submitted warnings. The warnings, according to the Defendants own words, were "attempts to hold JR accountable to produce leads, and JR simply didn't follow through." These warnings, according to Defendant, "were documented repeatedly between January, 2014 and August, 2014."

148. Defendants made the aforesaid misstatements and factual omissions to Miller with the intent that he and, through him, his business entity should rely upon same in deciding to invest and entrust monies to Defendant Duchene and the Inspired Green enterprise.

149. Plaintiffs have suffered financial losses, interest expense, and attorney's fees as a result of Defendants' wrongful acts.

150. Further, Defendants' acts were committed knowingly, maliciously, and with willful and wanton disregard to Plaintiff's rights. Plaintiff has suffered stress, anger, outrage, as a result of Defendants' violation of his rights and he is entitled to Exemplary Damages as a result.

33

## COUNT FOUR: VIOLATION OF MICHIGAN'S FRANCHISE INVESTMENT LAW, MCL 445.1501 *et seq*

*As against Defendants Dennis Duchene, Ann Duchene, John Doe, Inspired Marketing, and Inspired Business Development*

151. Plaintiffs repeat and re-allege the factual matter and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

152. The investment agreement that Defendant Duchene sold to Plaintiff is a "franchise" as defined by MCL 445.1502(3).

153. Plaintiffs were "franchisees" as defined by MCL 445.1502(4).

154. Defendant Inspired Business Development was a "franchisor" as defined by MCL 445.1502(5) and was registered with the State of Michigan as a franchisor.

155. Defendants John Doe were persons who "indirectly control[led] a person liable" under the Act, because they, as the "Board of Advisors," approved and ratified the scheme and artifice to defraud franchise investors.  Therefore, they are liable in this claim pursuant to MCL 445.1532.

156. Defendant Ann Duchene is a person similarly situated to an employee of Inspired Marketing and Inspired Business Development who materially aided in the scheme or artifice to defraud in the sale of franchise investments and, therefore, is a person liable in this claim pursuant to MCL 445.1532.

157. Defendant Inspired Marketing was a business entity that "indirectly control[led] a person liable" under the Act because it approved and ratified the scheme and artifice to defraud franchise investors.  Therefore, it is liable in this claim pursuant to MCL 445.1532.

158. Prior to selling / offering the "franchise" to Plaintiff, Defendants were required to provide him with a detailed disclosure statement that conforms with the statutory requirements of MCL 445.1508.  Plaintiff was never provided with a disclosure document that conformed with MCL 445.1508.

34

159. Defendants made the Franchise Offering prior to being registered with the State of Michigan.

160. With a legal franchise offer, defendants would have provided plaintiffs a franchise disclosure document that would have revealed defendants financial position, given plaintiffs the opportunity to contact other franchisees, and assisted potential franchisees in making informed decisions.  They failed to do so.

161. Further, Defendants, and each of them, made false and untrue statements as to the financial viability of the franchise in question, and omitted statements material to the financial condition of the franchise in violation of MCL 445.1523.

162. Defendants, and each of them, employed a scheme or artifice to defraud, made false and untrue statements as to material facts, and engaged in acts, practices, or courses of business towards Plaintiff that operated as a fraud or deceit upon him, or approved and ratified same, in violation of MCL 445.1505.

163. Pursuant to MCL 445.1525(1), Plaintiff may rescind the agreement, recover the consideration paid to Defendants, plus 12% per year in interest on the monies paid, together with attorney's fees and court costs.

## COUNT FIVE: EQUITABLE RESCISSION

164. Plaintiffs repeat and re-allege the factual matter and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

165. Plaintiff entered into an agreement with Defendant Dennis Duchene and his son, nonparty JR Miller.  **Ex. O** – Agreement to License; **Ex. J** – Operating Agreement Inspired Green Columbus, LLC.

35

166. Plaintiff Miller signed the Operating Agreement (Exhibit J) on his own behalf and on the behalf of his business entity, BG & M, Inc.

167. Miller gave $20,000 in consideration to Defendant Duchene for entry into these agreements.

168. It is unlikely that Duchene's misrepresentations as to the facts upon which Miller relied in entering these agreements were made in good faith. Miller's assent to these agreements was procured through fraud, as described herein. However, even if Duchene's representations were "innocent," Miller would be entitled to rescission of these agreements because of the false and incorrect statements made in procuring his assent.

169. Wherefore, Plaintiffs hereby request that this Court RESCIND the agreements that Miller entered into with Defendant Duchene, VOID the written contracts, and order Defendants to repay Plaintiff's $20,000 together with interest.

### COUNT SIX: CIVIL CONSPIRACY in violation of MICHIGAN LAW
*As against all Defendants*

170. Plaintiffs restate and re-allege the factual statements and legal assertions contained in the previous numbered paragraphs as though fully restated herein.

171. Defendant Dennis Duchene made a series of false representations to potential investors, lenders, "franchisees," "market zone purchasers" and other individuals as to the historical profitability and current financial status of the "Inspired Green" organization in order to cause them to pay monies to the organization.

172. Defendants DAVID BRIGGS, JAMAL DAOUD, JEFF GIBSON, JAY MESSNER, DOUG SUMNER, and CHIP NEILSON, the members of the "Board of Advisors" approved and

ratified Duchene's decision to misrepresent the financial status of the business in order to secure loans and sales of franchises to persons such as John Thomas Miller.

173. Defendant Ann Duchene organized a business entity, Catalyst Holdings, LLC, and allowed it to be used in furtherance of the scheme. Further, Defendant Ann Duchene assented to a financial transaction with Dennis Duchene wherein the family home was refinanced and his name was removed from the title, in order to avoid claims against this asset resulting from Duchene's misconduct. In addition, proceeds from this fraudulent enterprise, it is believed and herein alleged, were used to make payments on this home.

174. It was the intent of these individuals that persons similarly situated to the Plaintiffs, and including the Plaintiffs, should pay monies to the Inspired Green organization.

175. Plaintiffs did, in fact, pay monies to the Inspired Green organization and suffered loss as a result.

176. Plaintiffs have suffered financial losses, interest expense, and attorney's fees as a result of Defendants' wrongful acts.

177. Further, Defendants' acts were committed knowingly, maliciously, and with willful and wanton disregard to Plaintiff's rights. Plaintiff has suffered stress, anger, outrage, as a result of Defendants' violation of his rights and he is entitled to Exemplary Damages as a result.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Honorable Court grant them the following relief against all Defendants, jointly and severally:

1. Equitable rescission of the operating agreement and all agreements which he entered with Defendant Duchene,

37

2. Three fold damages for the monies he paid to Defendants, in the amount of $60,000, pursuant to 18 USC 1964(c),

3. Interest at the statutory rate of 12% on the funds wrongfully received and withheld, from the date of payment to Defendants to the date of filing this action,

4. Pre and post judgment interest and the appropriate statutory rate of 12%,

5. Attorney's fees and litigation costs as allowed by statute,

6. Punitive and exemplary damages as determined by a jury, but in an amount not less than $120,000, and

7. Such other relief as this Court should deem appropriate in Law or in Equity.

Respectfully Submitted,

Date: 7/18/2018

Collin H. Nyeholt (P74132)
Attorney for the Plaintiff

38

*Miller v. Duchene et al*
Complaint

# Exhibit A

**FOR ATTORNEY / LAW FIRM PURPOSES ONLY**         DENNIS JOHN DUCHENE II - Comprehensive Report

**Important:**                                                                          **ONLINE REPORT**

This is NOT a CONSUMER REPORT and does not constitute a "consumer report" under the Fair Credit Reporting Act ("FCRA"). This report may not be used to determine the eligibility for credit, insurance, employment or any other purpose regulated under the FCRA.

This system may be used only in accordance with your Subscriber Agreement, the Gramm-Leach-Bliley Act ("GLBA"), the Driver's Privacy Protection Act ("DPPA") and all other applicable laws.   User agrees to having knowledge of all applicable laws pertaining to the usage of data. User accepts all responsibility civilly and criminally for any use of this system.

Violations of these restrictions or misuse of this system will cause your access to be terminated and will cause an immediate investigation.

## Comprehensive Report

**Comprehensive Report**          **Report Legend**                                **Relatives**
**Date:** 12/09/2015                ✔  - Confirmed Address              **S**  > - 1st Degree of Separation
**Reference ID: NONE**               - Deceased Person    **S**  >> - 2nd Degree of Separation
                                                                         **S**  >>> - 3rd Degree of Separation

### Subject Information                                            ### Indicators

(Best Information for Subject)        **Other Names Associated with Subject**     Bankruptcies: **No**
                                      None found                                   Liens: **Yes**
Name: DENNIS JOHN DUCHENE II (12/01/1996   **Other DOBs Associated with Subject**   Judgments: **Yes**
to 08/06/2015)                        None found                                   Properties: **Yes**
Date of Birth: ▓▓▓▓▓▓ Born 40 years                                               Corporate Affiliations: **No**
ago                                   **Other Possible Phones Associated with**    Criminal/Traffic: **No**
                                      **Subject:**                                 Global Watch Lists Match: **No**
SSN: ▓▓▓▓▓ issued in **MICHIGAN**       ▓▓(ET) (LandLine) (100%)
between **1977-1978**                 ▓▓(ET) (Mobile) (99%)                       **Email Addresses Associated with**
                                      ▓▓(ET) (90%)                                **Subject**
                                      ▓▓(ET) (Mobile) (66%)
Other Individuals Observed with shared SSN: **No**   ▓▓(ET) (Mobile) (66%)        ▓▓▓▓▓▓▓▓
ne                                    ▓▓(ET) (LandLine) (66%)
                                      (LandLine)

### Potential Subject Photos (None Found)

### Comprehensive Report Summary

Bankruptcies: **None found**
Possible Phones: **8 found**
Driver's License: **None found**

**EXHIBIT E - Page 43 of 121**

DENNIS JOHN DUCHENE II - Comprehensive Report

## Bankruptcy Records (None Found)

## Liens (2 Found)

Last Refile Or Lien Extension Date: **10/17/2022**
Recording Date: **11/13/2012**
Tax Lien Date: **11/01/2012**
Federal Tax Lien Area: **Small Business**
DENNIS J DUCHENE II[ View Person Record ]
Address: **10445 S WRIGHT RD, EAGLE, MI 48822-9797 (Clinton COUNTY)**
Filing County: **Clinton, MI**
Total Lien Amount: **$81,910**
Deed Category Type: **Placement**
Damar Document Type: **Federal Tax Lien**
Federal Tax Lien Area: **Small Business**
Tax Lien Serial Lien Certificate Number: **903741912**
Kind Of Tax: **6672**
Tax Period Minimum: **12/31/2011**
Tax Period Maximum: **03/31/2012**
Federal Tax Lien Prepared And Signed City: **DETROIT**
Federal Tax Lien Prepared And Signed State: **MI**

Filing Date: **11/13/2012**
DENNIS J DUCHENE[ View Person Record ]
Address: **10445 S WRIGHT RD, EAGLE, MI 48822-9797 (Clinton COUNTY)**
Total Lien Amount: **$0**
Alternate Court Case Number: **00532576136**

## Judgments (3 Found)

DENNY DUCHENE[ View Person Record ]
Address: **3351 REMY DR, LANSING, MI 48906-2728 (Ingham COUNTY)**
Filing County: **Clinton, MI**
Filing Type: **SMALL CLAIMS JUDGMENT**
Plaintiff: **ERIC BORDEAUX**
Court Case Number: **09004046SC**
Total Judgment Amount: **$355**
Court: **MUSKEGON COUNTY 60TH DISTRICT COURT(MIMUSL1)**
Court Address: **990 TERRACE, MUSKEGON, MI 49442 (Muskegon COUNTY)**
Court Phone: **(231) 724-6383**
Filing Date: **01/20/2010**

DENNY DUCHENE[ View Person Record ]
Address: **10445 S WRIGHT RD, EAGLE, MI 48822-9797 (Clinton COUNTY)**
Filing County: **Clinton, MI**
Filing Type: **CIVIL JUDGMENT**
Plaintiff: **MCCARDEL RESTORATION LLC**
Court Case Number: **091883GC**
Total Judgment Amount: **$20,546**
Court: **CLINTON COUNTY 65A DISTRICT COURT(MICLIL1)**
Court Address: **100 E STATE STREET, STE 3400, ST JOHNS, MI 48879 (Clinton COUNTY)**

Court Phone: **(989) 224-5150**
Filing Date: **10/14/2009**

**DENNIS DUCHENE**[ View Person Record ]
Address: **105 PERRY ST APT 202, GRAND LEDGE, MI 48837-1392 (Eaton COUNTY)**
Filing County: **Eaton, MI**
Filing Type: **CIVIL JUDGMENT RELEASE**
Plaintiff: **RIVERWALK LDHA**
Court Case Number: **013737LT**
Total Judgment Amount: **$1,789**
Court: **EATON COUNTY 56TH DISTRICT COURT(MIEATL1)**
Court Address: **1045 INDEPENDENCE BLV, CHARLOTTE, MI 48813 (Eaton COUNTY)**
Court Phone: **(517) 543-7500**
Filing Date: **01/07/2002**
Release Date: **04/19/2005**

## Current Property Deeds (1 Found)

Purchase Date: 07/30/2004

DETROIT, MI 48228 (WAYNE COUNTY)                          Latest Tax Roll/Assessment Information
APN: **130000020028**                                    Sale Date: **07/30/2004**
APN Sequence Number: **000**                             Sale Amount: **$372,000**
Date Subject First Seen as Owner: **07/30/2004**
Date Subject Last Seen as Owner: **07/30/2004**

### Most Current Ownership Information – 07/30/2004

| |
|---|---|
| Owner: **DENNIS DUCHENE**<br>Owner: **ANN E DUCHENE**<br>Owner: **THOMAS J LOWE**<br>Mailing Address: **200 RIVER PLACE DR APT 28, DETROIT, MI 48207-4464 (Wayne COUNTY)**<br>Seller: **RIVER REVITALIZATION LLC**<br>**DETROIT, MI 48228 (WAYNE COUNTY)**<br>Owner Relationship Type: **Husband/Wife**<br>Sale Date: **07/30/2004**<br>Sale Amount: **$372,000**<br>Deed Sec Cat: **New Structure Sale, Cash Purchase, Residential (Modeled)**<br>Property Indicator: **Condominium (Residential)**<br>Resale New Construction: **New Construction**<br>Residential Model Indicator: **Based On Zip Code and Value**<br>**Property is Residential** | **Mortgage**<br>No Mortgage |

## Past Property Deeds (3 Found)

Purchase Date: 10/15/2013

200 RIVER PLACE DR # 28302, DETROIT, MI 48207-4300 (WAYNE     Latest Tax Roll/Assessment Information
COUNTY)                                                      Tax Year: **2014**

FOR ATTORNEY / LAW FIRM PURPOSES ONLY              DENNIS JOHN DUCHENE II - Comprehensive Report

36-T6N-R4W, TH N 627 FT, E 214.5 FT, S 627 FT, W 214.5 FT TO      Baths: **2**
BEG.
Living Square Feet: **2,620**
Land Square Feet: **134,600**
Year Built: **1910**

**Most Current Ownership Information**

| | |
|---|---|
| Owner: **ANN DUCHENE**<br>Mailing Address: **10445 S WRIGHT RD, EAGLE, MI 48822-9797**<br>**(CLINTON COUNTY)**<br>**10445 S WRIGHT RD, EAGLE, MI 48822-9797 (CLINTON COUNTY)**<br>Absentee Indicator: **Owner Occupied**<br>Universal Land Use: **Single Family Residence**<br>Property Indicator: **Single Family Residence** | **Mortgage Information not available** |

**Previous Ownership Information - 10/30/2013**

| | |
|---|---|
| Owner: **DENNIS DUCHENE**<br>Owner: **ANN DUCHENE**<br>Mailing Address: **10445 S WRIGHT RD, EAGLE, MI 48822-9797**<br>**(Clinton COUNTY)**<br>**10445 S WRIGHT RD, EAGLE, MI 48822-9797 (CLINTON COUNTY)**<br>Owner Ownership Rights: **Joint Tenants**<br>Owner Relationship Type: **Husband/Wife**<br>Sale Date: **10/30/2013**<br>Absentee Indicator: **Situs Address Taken From Sales Transaction - Determined Owner Occupied**<br>Deed Sec Cat: **Residential (Modeled)**<br>Universal Land Use: **Single Family Residence**<br>Property Indicator: **Single Family Residence/Townhouse**<br>Residential Model Indicator: **Based On Zip Code and Value**<br>**Property is Residential** | Mortgage:<br>Lender: **QUICKEN LNS INC** Mortgage Amount: **$245,400**<br>Mortgage Loan Type: **Conventional**<br>Mortgage Deed Type: **Mortgage**<br>Mortgage Term: **30 Years**<br>Mortgage Date: **10/30/2013**<br>Mortgage Due Date: **11/01/2043**<br>Mtg Sec Cat: **CNV, Fixed, Refinance, Conforming**<br>Refi Flag: **Loan to Value is More Than 50%** |

**Previous Ownership Information - 09/10/2012**

| | |
|---|---|
| Owner: **DUCHENE ANN LIVING TRUST**<br>Mailing Address: **10445 S WRIGHT RD, EAGLE, MI 48822-9797**<br>**(CLINTON COUNTY)**<br>Seller: **ANN DUCHENE**<br>**10445 S WRIGHT RD, EAGLE, MI 48822-9797 (CLINTON COUNTY)**<br>Owner Ownership Rights: **Revocable Trust**<br>Business Name: **DUCHENE ANN LIVING TRUST**<br>Sale Date: **09/10/2012**<br>Absentee Indicator: **Situs Address Taken From Sales Transaction - Determined Owner Occupied**<br>Deed Sec Cat: **Interfamily Transfer, Resale, Residential (Modeled)**<br>Universal Land Use: **Single Family Residence**<br>Property Indicator: **Single Family Residence/Townhouse**<br>Inter Family: **Yes**<br>Resale New Construction: **Resale**<br>Residential Model Indicator: **Based On Zip Code and Value**<br>**Property is Residential** | **Mortgage Information not available** |

EXHIBIT E - Page 46 of 121

*Miller v. Duchene et al*
Complaint

# Exhibit B

# Gmail
by Google

John Miller ▮▮▮▮▮▮▮▮▮▮▮▮

## Docs
1 message

**Denny Duchene** <dduchene@inspiredbd.com>                    Thu, Jul 10, 2014 at 2:39 PM
To: John Miller ▮▮▮▮▮▮▮▮▮▮▮▮▮
Cc: JR Miller <jrmiller@goinspiredgreen.com>

Hi John,

It was good to grab a beer with you and JR yesterday.  Thanks for making the time!  I've attached the summary documents that we discussed yesterday.  Please see the offer summary, model spread sheet, and licensing agreement.  Let me know if you have any other questions.

Thanks!

Denny

**3 attachments**

🖼 **AGREEMENT TO LICENSE - OPERATOR.pdf**
38K

🖼 **HP Licensing Model GZI - OPERATOR - SINGLE POD.xlsx**
34K

🖼 **Powered by Inspired Green - Owner-Operator.pdf**
1408K

# 3

*Miller v. Duchene et al*
Complaint

# Exhibit C



PROPERTY OF INSPIRED BUSINESS DEVELOPMENT, LLC - CONFIDENTIAL

**Prepared for:**

# Introducing POWERED by INSPIRED GREEN

*Inspired Green is in the business of supporting home performance contractors, both new and experienced. Our goal is to provide fully functioning systems that allow a contractor to immediately step into a home performance business that is scalable, profitable, and sustainable.*



Figure 1: Inspired Green's Closed Loop – A System for Home Performance Best Practices

## Home Performance Today

From where we stand, home performance is one of the most important industries in the United States today. We all know that residential construction exploded in our country from 1946 to 2008. What many don't realize is that our building codes and best practices didn't really account for the movement of heat, air, and moisture effectively. The net result is that we 25,000,000 or more families living in homes with challenges related to high maintenance costs, run away energy costs, allergens and asthma triggers, elevated levels of carbon monoxide and other indoor pollutants, and general discomfort. Since the early 2000's, these realities moved to center stage for the DOE, EPA, and many State governments. And an industry was born...

Today, we're making real strides in new codes that take proper science into consideration. That's great for new construction, but it doesn't address the 100 million existing homes in our country. The key tasks of a home performance contractor are:

➢ To elevate home owner awareness in existing, poorly performing homes
➢ To provide those home owners with a solid diagnostic solution that shows them exactly where their problems exist
➢ To offer permanent solutions that restore their family's ability to experience the right kind of living environment related to their house's performance

This is a calling, not a job. This is a blend of science, systems, and construction. This requires advanced training and a commitment to the well-being of families. The Powered by Inspired Green system allows you to accomplish all of these things without a steep learning curve. It's "plug and play" if you're willing to learn and commit to our model. We want to see the equation change from one in which families are paying a steep price in health, safety, and maintenance costs to one in which those same families get to have true peace of mind as they do life together in their home. We've created a proven infrastructure to make that impact. Are you a part of the new equation?

# What We Do For You – Closed Loop Support

## Strategic Planning

Most HP operators don't have the time or experience to build a solid strategic plan, even though they see the value in having one. At the outset of our relationship with you, Inspired Green will:

> - Help you determine the right exclusive market segment, which consists of 90,000 single family, owner occupied homes with home values and household incomes at or above the average for the market
> - Assess your current team for optimum understanding of skills and communication styles
> - Assess your current business to identify natural alignments and possible constraints while integrating the Inspired Green model
> - Provide ALL forms, systems, and pricing models for a complete home performance business as tested over thousands of home performance audits and retrofit projects

## Client Acquisition



Inspired Green will launch a non-profit lead generation and home performance audit program in your exclusive market segment. What this means is that our non-profit partner will find the clients, sell them a home performance audit, provide the audit, and sell your company the Scope of Work for retrofit. It is then up to your team, as guided by Inspired Green's system, to sell the home owner on the recommended Scope of Work. Our typical conversion rate from audit to sold retrofit project is 65% over the last 3,000 appointments. A fully functioning market segment produces 15 – 20 retrofit SOW's on a weekly basis. You never have to conduct audit test in or out, nor do you have to wonder what your lead pipeline will look like.

## Data, Metric, and Project Management

Inspired Green provides your internal consultants with daily training and support. Even further, your company is assigned a Project Specialist, who serves as your team's Program Administrator and your home performance client's single point of contact from retrofit sale through the completion of their project. The Project Specialist manages all of the project data in our proprietary home performance data base. You can request reports on any aspect of your sales or project performance without EVER having to enter or maintain the details. Your consultants simply email, call, or text updates to the Project Specialist and the rest takes care of itself. 100% of your relationship with the client is summarized in a single spot and things no longer fall through the cracks.

Your client and installation crew are also coordinated by the Project Specialist. From your client's perspective, once your internal consultant secures a contract the project specialist is their single point of contact for their project moving forward. This ensures that they have the best possible experience.



## Daily Training Community

One of the most important things you'll experience as part of the Inspired Green community is daily training. Each day at 9:30 AM key team members will join a 30 minute video webinar, facilitated by an Inspired Green Mentor, focused on proper client messaging and best practices. You'll be able to interact with other Powered by Inspired Green operators, discuss successes and constraints, and get real world direction on deploying the system in your market. There is no substitute for this kind of peer interaction. Each session is recorded for your reference.

INSPIRED MARKETING, LLC CONFIDENTIAL. DO NOT DISTRIBUTE WITHOUT CONSENT – 2

### Client Feedback

Most contractors don't have great systems for getting a picture of what their clients experienced from the home owner's perspective. Powered by Inspired Green includes the Deep Dive client feedback system. We connect with each completed retrofit from a third party perspective and interview them regarding their experience. Then, we create a comprehensive report for your team that lets you know exactly how you're doing from the client's point of view. Lastly, we convert satisfied clients into recorded audio testimonials, written testimonials, repeat clients, and immediate referrals. The goal is to make sure that their satisfaction is the number one priority, then to give them tangible ways to actively participate in referring your company.

### Conclusion

Here's what you need to ask yourself:

> - **Are you passionate about home performance?**

> - **Do you like the idea of connecting with proven systems instead of reinventing the wheel?**

> - **Do you have income goals that are greater than $500,000 per year for your company?**

The Powered by Inspired Green model doesn't work in pieces. We're looking for committed partners. We know what the system produces. We know how to create value in the minds of the home owner. Whether you're an HVAC contractor, another home service provider, an entrepreneur looking for new opportunities, or you're already in the home performance industry, if you are willing to learn and you answer the questions above with a "yes", please contact us as soon as possible.

## Cost Model

Our model depends upon two major commitments:

1. You need to commit to our non-profit lead generation strategy. This is how it works:



These fees cover all of your marketing, sales and audit costs. You have no additional fees for acquiring the retrofit project.

2. You commit to the Powered by Inspired Green licensing system. All of the services described above are included in the pricing per market segment. Here's how it works:

> - $30,000 one-time fee to secure exclusive assignment of a market zone comprised of 90,000 qualified homes as defined below:
>   - $50,000+ household income
>   - $125,000+ home value
>   - Confirmed home owner

> - 12% revenue share on all projects sold through the Non-Profit lead pipeline
>   - This covers ALL costs associated with being in the Inspired Green community, including Deep Dive and Project Specialist
>   - A typical Powered by Inspired Green contractor will retain 29% of the revenue from a contract AFTER labor, material, internal commissions, Inspired Green, and marketing fees are paid in full. (See Model Below)

### POWERED by INSPIRED GREEN PROJECTED PERFORMANCE MODEL (Based upon a single Pod in Year 1)

**RETROFIT SALES PROJECTED PRODUCTION/ MARKET ZONE**

| | Stats | Weekly | Monthly | Annually |
|---|---|---|---|---|
| HPAG Scopes of Work | | 4.54 | 19.66 | 235.00 |
| Presentation Rate | 88% | | | |
| Presentations/Wk | | 3.99 | 17.30 | 207.00 |
| Conv % | 60% | | | |
| Gross Sales | | 2.40 | 10.38 | 124.00 |
| Ave Sale | $5,000 | | | |
| Gross Revenue | | $11,975.04 | $51,891.84 | $622,702.08 |
| Cxl % | 20% | | | |
| Net Revenue | | $9,580.03 | $41,513.47 | $498,161.66 |
| Admin Fee % | 12% | | | |
| Admin Fee Revenue | | $1,149.60 | $4,981.62 | $59,779.40 |
| Net Rev + Admin | | $10,729.64 | $46,495.09 | $557,941.06 |
| Cost of Material % | 25.00% | ($2,395.01) | ($10,378.37) | ($124,540.42) |
| Cost of Labor % | 18.00% | ($1,724.41) | ($7,472.42) | ($89,669.10) |
| Cost of Commission % | 5.00% | ($479.00) | ($2,075.67) | ($24,908.08) |
| HPAG Marketing Fees | | ($1,827.86) | (7,921.17) | (95,054.07) |
| Inspired Green Fees | | (1,287.56) | (5,579.41) | (66,952.93) |
| | | | | |
| **Total Production** | | **Weekly** | **Monthly** | **Yearly** |
| Net Revenue | | $10,729.64 | $46,495.09 | $557,941.06 |
| Less COGS | | ($7,713.93) | ($33,427.05) | ($401,124.59) |
| Contractor Gross Profit | | $3,015.70 | $13,068.04 | $156,816.47 |
| Contractor GP % | 28.11% | | | |

Retrofit Installation Crew Calculations
- 7 Number of installations/crew/week
- 1 Number of crews necessary

Retrofit Sales Consultants Calculations
- 9 Number of leads/day/consultant
- 1 Number of consultants necessary

Home Performance Advocacy Group Marketing Fees
- $350 Rate/Assigned SOW
- 2.50% Retrofit Sale Revenue Share
- $82,250.00 Annual SOW Fees
- $12,454.04 Annual RF Revenue Share Fees
- ($95,054.07) Total Marketing Fees

Inspired Green Licensing Fees
- $50,000.00 1 Time Licensing Fee
- $0.00 Down Payment
- $0 Weekly Payment - Begin at day 31; in effect for 70 weeks
- 12% Retrofit Revenue Share %

### HPA-RF INCOME STATEMENT

| | | Weekly | | Monthly | | Yearly |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| RF | $ | 10,729.64 | $ | 46,495.09 | $ | 557,941.06 |
| Total | $ | 10,729.64 | $ | 46,495.09 | $ | 557,941.06 |
| | | | | | | |
| **Direct Costs** | | | | | | |
| RF | | ($7,713.93) | $ | (33,401.34) | $ | (400,816.04) |
| Total | $ | (7,713.93) | $ | (33,401.34) | $ | (400,816.04) |
| | | | | | | |
| **Indirect Costs** | | ($1,372.00) | $ | (5,940.76) | $ | (71,289.12) |
| | | | | | | |
| **Net Profit** | $ | 1,643.70 | $ | 7,122.71 | $ | 85,472.47 |
| | | | | | | **15.32%** |

**Owner Compensation**

$85,472.47   12 Full Strength Months, Single Pod

$399,000.00   12 Full Strength Months, Full Market Zone

*Miller v. Duchene et al*
Complaint

# Exhibit D

# AGREEMENT TO LICENSE

This agreement ("Agreement") is between INSPIRED BUSINESS DEVELOPMENT, LLC ("Licensor"), a Michigan Limited Liability Company doing business at 216 S. Bridge St, Grand Ledge in the State of Michigan and _____ and its affiliates ("Licensee"), a _____ Company doing business at _____ in the State of _____ for a license to use the following trademarks, processes, copyrighted material, and intellectual property ("Product") as defined by this agreement and necessary for engaging in the Powered by Inspired Green Home Performance Closed Loop Process:

1. Inspired Green Logo as trademarked (Reg. No. 4,342,325; SER. NO. 85-744,361; Registered May 28, 2013)

2. Snap Pad Client Relationship Management System – Managed by Inspired Business Development

3. All recorded training material from 2009 to current

4. Legal forms associated with the home performance sales and installation process

5. All collateral material design content and concepts related to residential energy efficiency

6. The Evidence Based Sales System as compiled (Presentation Book, Training Manual, and all other associated documents)

7. All forms associated with the home systems check up

8. All home performance pricing models

9. All accounting templates associated with residential home performance

10. All awards, articles, and interviews associated with Inspired Green

11. All process maps associated with residential home performance and staff acquisition

12. Home Performance Assessment report information gathering process and presentation format template

In consideration of the foregoing premises and the mutual covenants set forth in this Agreement and other valuable considerations, the parties agree as follows:

**1. License:** Licensor hereby grants Licensee a limited license to use Product for the permitted uses as set forth in this Agreement only. All other rights in and to the Product, including but not limited to all copyright and other intellectual property rights relating to the Product are retained by Licensor.

**2. Permitted Uses:** Licensee may only use the Product as follows:

    A.    Licensee may display Product either physically or electronically;

    B.    Licensee may extract or use information contained in Product for educational or research purposes, including extraction and manipulation of information for the purpose of illustration, explanation, example, comment, criticism, teaching, research, or analysis for internal training only;

    C.    Licensee may use Product as designed for the purpose of conducting daily client outreach, acquisition, and contracting of residential home performance services;

    D.    Licensor recognizes that any material, content, or process that already exists within the public domain (such as commonly accepted business best practices, sales methodology, or evidence from other published sources) is not covered by this agreement, though the unique language and composition associated with Product is covered;

    E.    Licensee affirms and accepts the perpetual requirement to use Product as designed at the execution of this agreement unless recorded or written consent is obtained by Licensor or its successors;

    F.    Licensee or its designee staff will participate in daily sales training events, daily mentoring, accounting procedures, and processes managed by Inspired Business Development, LLC that support this agreement as specified by Licensor;

    G.    Licensor reserves the right to audit Licensee's financial statements on a quarterly basis;

    H.    Licensee is required to use the Snap Pad Client Relationship Management system on a daily, accurate, and comprehensive basis to guarantee Licensor with transparent access to their company's performance, with full support of a designated Project Specialist employed by Licensor;

    I.    Licensee is required to use the Deep Dive client satisfaction survey system and a mandated field inspection process, as implemented by Licensor, for every residential home performance project to ensure protection of the Inspired Green brand reputation;

    J.    Licensee will work with Licensor to create a documented implementation plan and operating budget;

    K.    Licensor will maintain a minimum first year sales rate of not less than $250,000 as generated by its management of the client acquisition process on behalf of licensee;

L.  Licensee may use Product as defined in this agreement anywhere within a geography encompassing 90,000 qualified single family homes as specified in a separate Territory Agreement

**3. Prohibited Uses:** Licensee is prohibited from the use of Product not expressly permitted in the preceding section. Prohibited uses include but are not limited to:

A.  Using any aspect of the Product as part of a trade-mark, design-mark, trade name;

B.  Incorporating the Product in any way that results in a re-distribution or reuse of the Product or is otherwise made available in a manner such that a third party can extract or access or reproduce Product;

C.  Using the Product in a manner that is considered under applicable law to be pornographic, obscene, immoral, infringing, defamatory or libelous in nature, or that would be reasonably likely cause any person or property reflected in the Product to be seen in a false light;

D.  Removing any notice of copyright, trade-mark or other proprietary right from any place where it is on or embedded in the Product;

E.  Sub-license, re-sell, rent, lend, assign, gift or otherwise transfer or distribute the Product; Licensee may not transfer this Agreement or any rights granted under this Agreement without the consent of Licensor, and such consent shall not be unreasonably withheld, delayed, or conditioned by Licensor.

**4. Term:** The grant of this license is effective as of the signing of this Agreement is perpetual unless terminated by Licensor due to violations of the terms of this Agreement. The license may be terminated by Licensor if at any time Licensee fails to comply with any of its terms of use as stated in this Agreement and Licensor can reasonably demonstrate this infraction. Upon termination, Licensee must immediately cease all use of Product and if requested, confirm to Licensor in writing compliance with these requirements.

Licensor further reserves the right to elect at a later date to revoke or amend the license granted by this Agreement upon notice, sent to the address or contact information provided by Licensee, for violation or deviation from the terms set herein.

**5. Payment:** Licensee agrees to pay Licensor the following for use of Product:

A.  $30,000 USD Single Zone License Acquisition fee paid at execution.
B.  12% revenue share for all revenue collected as a result of these services;
C.  Payment shall be due to Licensor on the Tuesday of each week following the week of revenue collected.

**6. Warranties:** Licensor grants no rights and makes no warranties regarding the use of names, people, trademarks, trade dress, patented or copyrighted designs or works of art or architecture or other forms of intellectual property represented in any Product.

THE PRODUCT IS PROVIDED "AS IS" WITHOUT REPRESENTATION, WARRANTY OR CONDITION OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED REPRESENTATIONS, WARRANTIES OR CONDITIONS OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. LICENSOR DOES NOT REPRESENT OR WARRANT THAT THE PRODUCT WILL MEET LICENSEE'S REQUIREMENTS OR THAT ITS USE WILL BE UNINTERRUPTED OR ERROR FREE EXCEPT AS SPECIFIED HEREIN. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PRODUCT IS WITH LICENSEE UNLESS SPECIFIED HEREIN. LICENSEE ASSUMES THE ENTIRE RISK AND COST OF ALL NECESSARY CORRECTIONS DURING ITS USE OF PRODUCT. LICENSEE ASSUMES FULL TRANSFER OF AND ACCEPTS ALL HISTORICAL INSTALLATION WARRANTY AND SERVICE ISSUES ASSOCIATED WITH ALL PREVIOUS RESIDENTIAL RETROFIT CLIENTS OF LICENSOR WITHIN LICENSEE'S ASSIGNED TERRITORY.

**7. Indemnification:** Each party shall indemnify, assume the defense of, and hold harmless the other party and its directors, officers, employees, and agents from every claim, loss, damage, injury, expense (including attorney's fees), judgment, and liability of every kind, nature, and description arising in whole or in part from the indemnifying party's negligent, fraudulent, or illegal acts or omissions except, as to the party requesting indemnification, to the extent such Liability results in whole or in part from the unauthorized, negligent, fraudulent, or illegal act or omission of the party requesting indemnification.

**8. Amendments to License:** This license may only be amended by a writing signed by Licensee and authorized by Licensor.

**9. Legal Disputes:** This Agreement shall be governed by the laws of the state of Michigan. The parties waive any right to argue conflict of law principles. The Parties agree that any claim or dispute between them or against any agent, employee, successor, or assignee of the other, whether related to this Agreement or otherwise, and any claim or dispute related to this Agreement shall be first taken to binding arbitration. Any award of the arbitrator may be entered as a judgment in any court of competent jurisdiction. Further, should either party, successor or assignee of either party bring leading proceedings in connection with this Agreement the party or parties prevailing in such proceeding shall be entitled to their reasonable attorney's fees and costs from the non-prevailing party in addition to any other such relief as may be granted.

**10. Non-waiver:** No failure or neglect of either party hereto in any instance to exercise any right, power or privilege under this Agreement or under applicable law shall constitute a waiver of any other right, power or privilege in any other instance. All waivers by either party must be in wiring and signed by the party to be charged.

**11. Entire Agreement:** This Agreement contains the entire agreement and understanding between the parties and supersedes any prior or contemporaneous written or oral agreements,

representations and warranties between them respecting the subject matter of this Agreement. This Agreement may be amended only by a writing signed by Licensee and by a duly authorized representative of the Licensor. If any term, provision, covenant or condition of this Agreement, or the application to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

By signing this Agreement the parties acknowledges they have read the entire agreement and fully understand the terms, conditions and obligations of this Agreement.

**Licensee**

**Licensor**

_____

_____

Authorized Signature

Denny Duchene – It's CEO

_____

_____

Date

Date

*Miller v. Duchene et al*
Complaint

# Exhibit E

| Non-Profit Scopes of Work PER POD | | | | |
|---|---|---|---|---|
| HPA Sales/Tech | Day | Week | Month | Year |
| Technicians | 2 | | | |
| New Leads/Tech | 3 | 30 | 129.9 | 1558.8 |
| Confirm % | 80.00% | 24 | 103.92 | 1247.04 |
| Demo % | 70.00% | | | |
| Conv.% | 30.00% | | | |
| $/Sale | $475.00 | | | |
| CXL % | 10.00% | | | |
| Demos/Tech | 1.68 | 8.40 | 36.37 | 436.46 |
| Sales/Tech | 0.504 | 2.52 | 10.91 | 130.94 |
| CXL | 0.05 | 0.25 | 1.09 | 13.09 |
| Net Sales/Tech | 0.45 | 2.26 | 9.82 | 117.85 |
| TOTAL SOW's To Contractor | 0.91 | 4.53 | 19.65 | 235.87 |

| RETROFIT SALES PROJECTED PRODUCTION/ MARKET ZONE | Stats | Weekly | Monthly | Annually | | | |
|---|---|---|---|---|---|---|---|
| HPAG Scopes of Work | | 4.53 | 19.65 | 235.00 | | | |
| Presentation Rate | 88% | | | | | | |
| Presentations/Wk | | 3.99 | 17.30 | 207.00 | | | Retrofit Installation Crew Calculations |
| Conv % | 60% | | | | | 7 | Number of installations/crew/wee |
| Gross Sales | | 2.40 | 10.38 | 124.00 | | 1 | Number of crews necessary |
| Ave Sale | $5,000 | | | | | | Retrofit Sales Consultants Calculations |
| Gross Revenue | | $11,975.04 | $51,891.84 | $622,702.08 | | 2 | Number of leads/day/consultant |
| Cxl % | 20% | | | | | 1 | Number of consultants necessary |
| Net Revenue | | $9,580.03 | $41,513.47 | $498,161.66 | | | Home Performance Advocacy Group |
| Admin Fee % | 12% | | | | | | Marketing Fees |
| Admin Fee Revenue | | $1,149.60 | $4,981.62 | $59,779.40 | | $550 | Rate/Assigned SOW |
| Net Rev + Admin | | $10,729.64 | $46,495.09 | $557,941.06 | | 2.50% | Retrofit Sale Revenue Share |
| Cost of Material % | 25.00% | ($2,395.00) | ($10,378.37) | ($124,540.41) | | $82,250.00 | Annual SOW Fees |
| Cost of Labor % | 18.00% | ($1,724.41) | ($7,472.42) | ($89,669.10) | | $12,454.04 | Annual RF Revenue Share Fees |
| Cost of Commission % | -5.00% | ($479.00) | ($2,075.67) | ($24,908.08) | | ($95,054.07) | Total Marketing Fees |
| HPAG Marketing Fees | | ($1,827.96) | (7,921.17) | ($95,054.07) | | | |
| Inspired Green Fees | | (1,287.56) | (5,579.41) | (66,952.93) | | | Inspired Green Licensing Fees |
| | | | | | | $30,000.00 | 1 Time Licensing Fee |
| Total Production | | Weekly | Monthly | Yearly | | $0.00 | Down Payment |
| Net Revenue | | $10,729.64 | $46,495.09 | $557,941.06 | | $0 | Weekly Payment - Begin at day 31 |
| Less COGS | | ($7,713.93) | ($33,427.05) | ($401,124.59) | | 12% | Retrofit Revenue Share % |
| Contractor Gross Profit | | $3,015.70 | $13,068.04 | $156,816.47 | | | |
| Contractor GP % | 28.11% | | | | | | |

In effect for 70 weeks

**Actual Overhead Requirements**

| Expense Category | Week | Month | 12 Months | | | |
|---|---|---|---|---|---|---|
| **Executive Management** | | | | | | |
| President | $0.00 | $0.00 | $0.00 | | | |
| | | | | | | |
| **Mid Management** | | | | | | |
| Accounting/Office Administration | ($100.00) | ($433.00) | ($5,200.00) | | | |
| | | | | | | |
| **General Overhead** | | | | | | |
| Auto (truck payments/mainten) | $0.00 | $0.00 | $0.00 | | | |
| Computers | ($25.00) | ($108.25) | ($1,300.00) | | | |
| Customer Retention | ($50.00) | ($216.50) | ($2,600.00) | Auto Calculations | | |
| Dues and Subscriptions | ($10.00) | ($43.30) | ($520.00) | | 1 | # Work Crews |
| Equipment | ($50.00) | ($216.50) | ($2,600.00) | | 1 | # Manager Vehicles |
| Internet | ($25.00) | ($108.25) | ($1,300.00) | $75 | | Amount/Work Crew/Wk |
| Insurance | ($300.00) | ($1,299.00) | ($15,600.00) | $125 | | Amount/Mgr/Wk |
| Meals and Entertainment | ($25.00) | ($108.25) | ($1,300.00) | | | |
| Office Supplies | ($50.00) | ($216.50) | ($2,600.00) | | | |
| Printing | ($25.00) | ($108.25) | ($1,300.00) | | | |
| Professional Services | ($125.00) | ($541.25) | ($6,500.00) | | | |
| Rent | ($250.00) | ($1,082.50) | ($13,000.00) | | | |
| Telephones | ($25.00) | ($108.25) | ($1,300.00) | | | |
| Travel - Crews | $0.00 | $0.00 | $0.00 | | | |
| Travel - Other | $0.00 | $0.00 | $0.00 | | | |
| Utilities | ($100.00) | ($433.00) | ($5,200.00) | $125 | | Amount Gas Card/Crew/Wk |
| Misc Overh             20% | ($212.00) | ($917.96) | ($11,024.00) | Misc Travel Expenses | | |
| Subtotal | ($1,272.00) | ($5,507.76) | ($66,144.00) | | | |
| | | | | | | |
| **Total Projected Overhead** | ($1,372.00) | ($5,945.33) | ($71,344.00) | | | |

| HPA-RF INCOME STATEMENT | Weekly | Monthly | Yearly |
|---|---|---|---|
| **Revenue** | | | |
| RF | $10,729.64 | $ 46,495.09 | $ 557,941.06 |
| Total | $ 10,729.64 | $ 46,495.09 | $ 557,941.06 |
| | | | |
| **Direct Costs** | | | |
| RF | ($7,713.93) | $ (33,401.34) | $ (400,816.04) |
| Total | $ (7,713.93) | $ (33,401.34) | $ (400,816.04) |
| | | | |
| **Indirect Costs** | ($1,372.00) | $ (5,940.76) | $ (71,289.12) |
| | | | |
| **Net Profit** | $ 1,643.70 | $ 7,122.71 | $ 85,472.47 |
| | | | 15.32% |
| | | | |
| **Owner Compensation** | | | |
| $85,472.47 | 12 Full Strength Months, Single Pod | | |
| $399,000.00 | 12 Full Strength Months, Full Market Zone | | |

| Deployment Week | Action |
|---|---|
| 1 | HPAG places ads for 6 Home Performance Technicians, 3 Home Performance Consultants, and 3 Home Performance Auditors |
| 1 | HPAG holds first hiring seminar with target of hiring first complete Pod (2 HPT's, 1 HPC, 1 Auditor) |
| 1 | Inspired Green assigns Project Specialist |
| 1 | Licensee attends one week training in Grand Ledge, MI with emphasis on Closed Loop, the Evidence Based Sales model, and a |
| 1 | Corporate Confirming System is set up for new licensed territory (Calendars, Extensions, Designated Confirmer) |
| | |
| 2 | HPAG continues recruitment with second and third hiring seminars to recruit Pods 2 and 3 |
| 2 | Licensee and Project Specialist continue daily training on retrofit pricing and processes via video webinar |
| 2 | Licensee recruits installation crew |
| 2 | Licensee attends daily 30 minute training meetings at 9:30 AM led by Inspired Green's Corporate Trainer via video webinar |
| 2 | Corporate HPT Trainer conducts HPT training on location for the week (2 days class room, 3 days field) and selects the first Field |
| 2 | Corporate Sales Trainer conducts HPT training (Sales/HPT Management) |
| | |
| 3 | Initial Pods trained by Corporate HPT trainer are deployed with HPT as their overseer |
| 3 | HPT begins to run leads |
| 3 | HPT and licensee attend daily 30 minute training via video webinar |
| 3 | HPAG continues any additional needed recruitment |
| 3 | New Pods (or Pod members) are trained by Corporate staff via video webinar, then field trained by designated territory Field Tr |
| | |
| 4 | Full strength deployment and performance |
| 4 | Licensee begins to make Retrofit SOW presentations |
| 4 | Project Specialist manages all relationships from start to finish after an appointment is confirmed for HPA presentation |
| 4 | Install Crew is fully onboarded (Proper Sub Contractor Agreement; Project Specialist has trained them on the Install Work Orde |
| 4 | Licensee and HPAG staff are fully integrated into processes and training schedule |
| | |
| 5 | Continued performance improvement |
| | |
| 6 | Full strength performance achieved |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| general introduction to processes |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| d Trainer from the new hires |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| rainer |  |  |  |  |  |
|  |  |  |  |  |  |
| r process, final Measure process, and Invoice Submission process) |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

| Ramp Up Cash Flow | | | 1/3 Strength | | | | 1/2 Strength | |
|---|---|---|---|---|---|---|---|---|
| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 |
| **Expenses** | | | | | | | | |
| Down Payment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Weekly OH | ($1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) |
| Weekly Payment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Weekly HPAG | $0.00 | $0.00 | ($609.32) | ($609.32) | ($609.32) | ($609.32) | ($913.98) | ($913.98) |
| Weekly IG | $0.00 | $0.00 | ($214.59) | ($429.19) | ($429.19) | ($429.19) | ($536.48) | ($643.78) |
| Retrofit COGS (L/M/Comm) | $0.00 | $0.00 | ($79.04) | ($158.07) | ($1,517.48) | ($1,517.48) | ($2,299.21) | ($2,299.21) |
| **Income** | | | | | | | | |
| Retrofit Rev 50% Down | $0.00 | $0.00 | $1,788.27 | $1,788.27 | $1,788.27 | $1,788.27 | $2,682.41 | $2,682.41 |
| Retrofit Rev Final Payment | $0.00 | $0.00 | $0.00 | $1,788.27 | $1,788.27 | $1,788.27 | $1,788.27 | $2,682.41 |
| Net Cash Flow/Wk | ($1,372.00) | ($1,372.00) | ($486.68) | $1,007.97 | ($351.44) | ($351.44) | ($650.99) | $135.85 |
| Cumulative Cash Flow | ($1,372.00) | ($2,744.00) | ($3,230.68) | ($2,222.71) | ($2,574.15) | ($2,925.58) | ($3,576.57) | ($3,440.72) |
| | **Full Strength** | | | | | | | |
| | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 |
| **Expenses** | | | | | | | | |
| Down Payment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Weekly OH | ($1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) |
| Weekly Payment | ($500.00) | ($500.00) | ($500.00) | ($500.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| Weekly HPAG | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) |
| Weekly IG | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) |
| Retrofit COGS (L/M/Comm) | ($3,034.95) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) |
| **Income** | | | | | | | | |
| Retrofit Rev 50% Down | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 |
| Retrofit Rev Final Payment | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 |
| Net Cash Flow/Wk | $2,707.16 | $1,143.70 | $1,143.70 | $1,143.70 | $1,643.70 | $1,643.70 | $1,643.70 | $1,643.70 |
| Cumulative Cash Flow | $3,581.34 | $4,725.04 | $5,868.74 | $7,012.44 | $8,656.15 | $10,299.85 | $11,943.55 | $13,587.25 |
| | **Full Strength** | | | | | | | |
| | Week 25 | Week 26 | Week 27 | Week 28 | Week 29 | Week 30 | Week 31 | Week 32 |

| 2/3 Strength | | | Full Strength | |
|---|---|---|---|---|
| Week 9 | Week 10 | Week 11 | Week 12 | Totals |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | ($16,464.00) |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| ($913.98) | ($913.98) | ($913.98) | ($1,827.96) | ($8,835.15) |
| ($746.78) | ($849.79) | ($849.79) | ($1,068.67) | ($6,197.44) |
| ($2,299.21) | ($3,034.95) | ($3,034.95) | ($3,034.95) | ($19,274.59) |
| | | | | |
| $3,540.78 | $3,540.78 | $3,540.78 | $5,364.82 | $28,505.07 |
| $2,682.41 | $3,540.78 | $3,540.78 | $3,540.78 | $23,140.25 |
| $891.22 | $910.84 | $910.84 | $1,602.01 | |
| ($2,549.51) | ($1,638.67) | ($727.83) | $874.18 | |
| | | | | |
| Week 21 | Week 22 | Week 23 | Week 24 | |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | ($16,464.00) |
| $0.00 | $0.00 | $0.00 | $0.00 | ($2,000.00) |
| ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($21,935.55) |
| ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($15,450.68) |
| ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($53,617.52) |
| | | | | |
| $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $64,377.82 |
| $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $64,377.82 |
| $1,643.70 | $1,643.70 | $1,643.70 | $1,643.70 | |
| $15,230.95 | $16,874.65 | $18,518.35 | $20,162.05 | |
| | | | | |
| Week 33 | Week 34 | Week 35 | Week 36 | |

| Expenses | | | | | | | |
|---|---|---|---|---|---|---|---|
| Down Payment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Weekly OH | ($1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) |
| Weekly Payment | ($500.00) | ($500.00) | ($500.00) | ($500.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| Weekly HPAG | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) |
| Weekly IG | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) |
| Retrofit COGS (L/M/Comm) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) |
| Income | | | | | | | |
| Retrofit Rev 50% Down | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 |
| Retrofit Rev Final Payment | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 |
| Net Cash Flow/Wk | $1,143.70 | $1,143.70 | $1,143.70 | $1,143.70 | $1,643.70 | $1,643.70 | $1,643.70 | $1,643.70 |
| Cumulative Cash Flow | $21,305.76 | $22,449.46 | $23,593.16 | $24,736.86 | $26,380.56 | $28,024.26 | $29,667.96 | $31,311.67 |

| | Full Strength | | | | | | |
|---|---|---|---|---|---|---|---|
| | Week 37 | Week 38 | Week 39 | Week 40 | Week 41 | Week 42 | Week 43 | Week 44 |
| Expenses | | | | | | | |
| Down Payment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Weekly OH | ($1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) |
| Weekly Payment | ($500.00) | ($500.00) | ($500.00) | ($500.00) | ($500.00) | ($500.00) | $0.00 | $0.00 |
| Weekly HPAG | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) |
| Weekly IG | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) |
| Retrofit COGS (L/M/Comm) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) |
| Income | | | | | | | |
| Retrofit Rev 50% Down | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 |
| Retrofit Rev Final Payment | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 |
| Net Cash Flow/Wk | $1,143.70 | $1,143.70 | $1,143.70 | $1,143.70 | $1,643.70 | $1,643.70 | $1,643.70 | $1,643.70 |
| Cumulative Cash Flow | $39,030.17 | $40,173.87 | $41,317.58 | $42,461.28 | $44,104.98 | $45,748.68 | $47,392.38 | $49,036.08 |

| | Full Strength | | | | | | |
|---|---|---|---|---|---|---|---|
| | Week 49 | Week 50 | Week 51 | Week 52 | Totals | | | YEAR 1 GRAND |
| Expenses | | | | | | | |
| Down Payment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | Down Payment | $0.00 |
| Weekly OH | ($1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | ($5,488.00) | | Overhead | ($71,344.00) |

| | | | | |
|---|---|---|---|---|
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | ($16,464.00) |
| $0.00 | $0.00 | $0.00 | $0.00 | ($2,000.00) |
| ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($21,935.55) |
| ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($15,450.68) |
| ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($55,180.98) |
| | | | | |
| $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $64,377.82 |
| $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $64,377.82 |
| $1,643.70 | $1,643.70 | $1,643.70 | $1,643.70 | |
| $32,955.37 | $34,599.07 | $36,242.77 | $37,886.47 | |
| | | | | |
| Week 45 | Week 46 | Week 47 | Week 48 | |
| | | | | |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| (1,372.00) | (1,372.00) | (1,372.00) | (1,372.00) | ($16,464.00) |
| $0.00 | $0.00 | $0.00 | $0.00 | ($2,000.00) |
| ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($21,935.55) |
| ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($15,450.68) |
| ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($55,180.98) |
| | | | | |
| $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $64,377.82 |
| $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $64,377.82 |
| $1,643.70 | $1,643.70 | $1,643.70 | $1,643.70 | |
| $50,679.78 | $52,323.48 | $53,967.19 | $55,610.89 | |
| | | | | |
| | | | | |
| TOTALS | | | | |
| | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Weekly Payment | ($500.00) | ($500.00) | ($500.00) | ($500.00) | ($2,000.00) | | Weekly Payment | ($8,000.00) |
| Weekly HPAG | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($1,827.96) | ($7,311.85) | | Weekly HPAG | ($81,953.67) |
| Weekly IG | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($1,287.56) | ($5,150.23) | | Weekly IG | ($57,699.69) |
| Retrofit COGS (L/M/Comm) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($4,598.42) | ($18,393.66) | | Retrofit COGS | ($201,647.70) |
| Income | | | | | | | | |
| Retrofit Rev 50% Down | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $21,459.27 | | Retrofit DP | $243,097.78 |
| Retrofit Rev Final Payment | $5,364.82 | $5,364.82 | $5,364.82 | $5,364.82 | $21,459.27 | | Retrofit FP | $237,732.96 |
| Net Cash Flow/Wk | $1,143.70 | $1,143.70 | $1,143.70 | $1,143.70 | $4,574.81 | | NET INCOME | $60,185.69 |
| Cumulative Cash Flow | $56,754.59 | $57,898.29 | $59,041.99 | $60,185.69 | | | OWNER SALARY | $0.00 |
| | | | | | | | OWNER INCOME | $60,185.69 |

*Miller v. Duchene et al*
Complaint

# Exhibit F

# G☒ail
by Google

John Miller <██████████████████

## Pie Chart
1 message

**Denny Duchene <dduchene@inspiredbd.com>**
To: John Miller <████████████████
Cc: JR Miller <jrmiller@goinspiredgreen.com>

Wed, Jul 16, 2014 at 7:56 PM

John,

Here's the pie chart you requested. It shows our average sale and where the funds go. In essence, the operator retains just over $1600 in operating profit per project. Whatever doesn't go toward the fixed costs of the business, which you're in complete control of, stays with you. Let me know if you have any questions about this.

Thanks!

Denny

📎 **Powered by Inspired Green Average Project Break Down.docx**
26K

EXHIBIT E - Page 74 of 121

Powered by Inspired Green
Average Project Pricing and Profitability

**AVERAGE PROJECT SALE PRICE = $5376.00**



**Definitions of Terms:**

1. **Retained Ops Profit** - The revenue retained by the Franchise operator after all marketing, labor, materials, commissions, and revenue shares are paid. These funds are used to pay the fixed costs of the operation with the remainder being reinvested or distributed to the operator as they see fit.

2. **Labor/Material** – The fully loaded cost to install the project. This includes all subcontractor labor costs and the reimbursement for materials purchased by the subcontractor. All materials are managed by the subcontractor and are, therefore, included in this cost. Your company will not warehouse, store, or deliver any materials.

3. **Commission** – For purposes of this diagram, a commission of 7.5% is assumed. The model calls for a commission of 5%. This is at the discretion of the operator. Some operators may choose to pay more in commission as an incentive to consultants under certain circumstances. The inflated commission percentage is an attempt to anticipate these scenarios.

4. **IBD Rev Share** – This is the portion of the project paid to Inspired Business Development, LLC under your licensing agreement. The revenue share is 12%.

5. **SOW Marketing Fees – To NPO** – These fees are paid to the non-profit marketing partner for Scopes of Work. A Scope of Work is defined as a completed comprehensive home performance audit paid for by the home owner at a minimum of $300 each with demonstrable critical, high and low priority retrofit needs.

6. **NPO Rev Share** – This fee is also paid to the NPO as an additional revenue source when a retrofit project is sold. The revenue share is 2.5% of the total retrofit sale.

JM0048

*Miller v. Duchene et al*
Complaint

# Exhibit G

# G☒ail
by Google

John Miller <▬▬▬▬▬▬▬▬▬▬>

## Re: questions
1 message

**Denny Duchene** <dduchene@inspiredbd.com>
To: John Miller <▬▬▬▬▬▬▬▬▬▬>

Mon, Jul 28, 2014 at 5:23 PM

John,

That sounds great.  Here are the corrections.  Let me know if this all makes sense to you.

Denny

On 7/28/2014 3:55 PM, John Miller wrote:

Denny -

Attached is my basic understanding of the process.  There are a couple of areas  containing blanks that you could answer, in addition to correcting anything I may have wrong. From there I only have a few more questions.  You can bank on a decision by Friday, if not sooner.

Thanks.

- John

**GZI-IBD steps - Denny Edit.doc**
98K

Purchase Franchise from Inspired Green, Franchisor.

Select Market Zone (90,000 "qualified homes")

Select Green Zone (500 homes within the selected Market Zone)

Franchisee Training Begins and consists of ..............

# Item 11.  Franchisor's Assistance, Advertising, Computer Systems and Training

## Pre-opening Obligations.

Except as listed below, we need not provide any assistance to Applicant.

Before Applicant opens Applicant Licensed Business, we will:

1.  License Applicant to use our Marks and System in connection with Applicant Licensed Business (Franchise Agreement - Article );

2.  Designate Applicant Market Zone Territory (Franchise Agreement - Article );

3.  Issue Applicant an electronic copy of our Operations Manual ("the Manual") (Franchise Agreement - Article );

5.  Provide initial training for Applicant OR one manager, if applicable, and a Retrofit Consultant as follows:

| Subject | Time Begun | Instructional Material | Hours of Classroom Training* | Hours of On The Job Training* | Instructor* |
|---|---|---|---|---|---|
| Orientation to the Powered by Inspired Green System & Culture | Before Opening | Manual, Lecture, Slides, Webinar | 3 | NA | Jacob Flanders |
| Service Overview and Messaging Methodology | Before Opening | Manual, Lecture, Slides, Webinar | 12 | NA | Jacob Flanders/ JR Miller |
| Operations | Before Opening | Manual, Lecture, Slides, Webinar | 12 | NA | Assigned Corporate Project Manager |
| Support Systems & Computer Systems | Before Opening | Manual, Lecture, Slides, Webinar | 3 | NA | Mike Davis |
| Introduction to Daily Sales Training | Before Opening | Manual, Lecture, Slides, Webinar | 2 | NA | Jacob Flanders/ Mike Davis |
| Building Science Tutorial | Before Opening | Manual, Lecture, Slides, Webinar | 8 | NA | Jacob Flanders/ Mike Davis |

\* All times are approximate and We may adjust them based upon Applicant experience and rate of learning. Although the person(s) indicated will coordinate and be responsible for training, they may bring in other appropriate persons to actually conduct the training or some portion of it.

We do not charge for the initial training for Applicant or appropriate designees as defined by the Agreement (initial training for a total of three people is included in Applicant Franchise Fee), but Applicant must pay the travel and living expenses for Applicant and Applicant employee(s).  All training occurs at our online training center and, at the Applicant's discretion, at one or more functioning licensed businesses.  Please refer to Item 2 for information regarding the experience of the training instructors.  Applicant and appropriate designees must successfully complete the initial training program. We will decide whether Applicant successfully completes the initial training program based upon knowledge, test results, and our observations of Applicant ability to use the knowledge effectively.

JM0053

for a period of ...............
IBD assigns a Project Manager, an IBD employee, who oversees all systems and accountability for the franchise. This individual is trained in all aspects of the Operating Manual and submits daily/weekly performance reports on key metrics to the franchisee.

Inspired Business Development (IBD) assigns a Project Specialist, an IBD employee who trains the Franchisee and manages all relationships from start to finish after an appointment is confirmed for presentation, including all communications with homeowners and sub-contractors.

The goal is to have 13 "pods" in action within 6 weeks and 3 pods in action within 12 weeks. A pod consists of 1- 2 Marketing Researchers eps (door-to-door) who deploy the Green Zone Initiative (a multi-stage marketing platform in partnership with the neighborhood's elementary school),
1 Home Performance Consultant, and 1 Retrofit Consultant.Salesman. The Marketing Reps and Home Performance Consultants are employees of the non-profit partner.Great Lakes. The Retrofit Consultant is an employee of the franchise.
IBD trains the Marketing Reps. The Marketing Rep sets an appointment when both husband & wife will be home for a free 40 minute visual inspection by a Great Lakes Consultant. IBD also trains all consultants, both home performance and retrofit, on a daily basis via the internet. All training sessions are recorded and accessible by the franchisee at any time.

The Consultants perform a free visual inspection and sell the homeowner an agreement to test the home. 34% of homeowners who have historically experienced the free visual inspection agreed to purchase a -Test. This is true over the last 10,000+ appointments. IBD trains these Consultants. An auditor, employed by the non-profit partner,-who also performs the test. The homeowner pays Great Lakes $3,475.00 for the test. The test results are called a Scope of Work Project.

The Franchisee buys each Scope of Work Project from the non-profit partnerGreat Lakes for $350.00. The Franchisee also pays the non-profit partner a 2.5% revenue share for retrofits sold.

IBD hires and trains a Retrofit ConsultantSalesman. The Franchisee may choose to hire, train, or be the RFCSalesman.
The RFCSalesman, on behalf of Franchisee and by appointment, presents the test results to the homeowners to decide actions to take. 72% of those tested have historically agreed to have work done.
The average sale is historically approximately $5,000.00. The Homeowner pays 50% down with the balance due when the work is done, payable to Franchisee's dba.

JM0054

Up to 20% of home owners are declined for financing or decide not to proceed with their SOW. 20% of homeowners cancel the signed agreement to have work done.

The average length of time from completion of a Test to the end of a project is 34 days.

Proceeds (approximates)
37% is paid to sub-contractors for labor and materials.
25% is royalties paid to IBD and Great Lakes.
7% is commission paid to the Salesman.
31% of the sale is retained by the Franchisee.



JM0055

*Miller v. Duchene et al*
Complaint

# Exhibit H



John Miller <██████████████>

## Re: Columbus Franchise
1 message

**Denny Duchene** <dduchene@inspiredbd.com>                      Fri, Aug 1, 2014 at 6:33 PM
To: Brendan Kent <bkent73@gmail.com>
Cc: John Miller <████████████████>

See you then!

On Aug 1, 2014 6:31 PM, "Brendan Kent" <bkent73@gmail.com> wrote:
⑧ See you on Tuesday!

Brendan

On Fri, Aug 1, 2014 at 6:30 PM, Denny Duchene <dduchene@inspiredbd.com> wrote:
⑦ Ha...you still only replied to me! John is CC'd here. Let's plan on your arrival at 11 AM on Tuesday.
John, can you do lunch? Crunchy's again? Or Cugino's?

Denny

On Aug 1, 2014 6:26 PM, "Brendan Kent" <bkent73@gmail.com> wrote:

I can either get in around 11 am, or come the night before and start first thing.

On Aug 1, 2014 6:24 PM, "Denny Duchene" <dduchene@inspiredbd.com> wrote:

Can you resend to "all"

On Aug 1, 2014 6:22 PM, "Brendan Kent" <bkent73@gmail.com> wrote:
⑥ I can either get in around 11 am, or come the night before and start first thing.

On Aug 1, 2014 6:15 PM, "Denny Duchene" <dduchene@inspiredbd.com> wrote:
⑤ Alright. Let's plan on Tuesday/Wednesday. What time would you arrive on Tuesday?  I'd like
to make sure we get on John's schedule asap.

Denny
On 8/1/2014 5:23 PM, Brendan Kent wrote:
④ I would love to stay at your place. I am heading to Kent tomorrow. Tuesday and
Wednesday would be ideal.

On Aug 1, 2014 5:16 PM, "Denny Duchene"< dduchene@inspiredbd.com>
wrote:
③ Grand Ledge is great. You can stay at our place if that works. John is
available on Tuesday all day, so either Monday/Tuesday or
Tuesday/Wednesday?

On Aug 1, 2014 5:14 PM, "Brendan Kent" <bkent73@gmail.com>wrote:

*Miller v. Duchene et al*
Complaint

# Exhibit I

Brendan declined partnering.  Says he needs to be extremely confident in his partner.

JR and I already discussed a simple solution to Brendan's concerns. JR will simply work as the Project Manager for IBD, letting Brendan get what he needs in terms of confidence while preserving your 50/50 with Brendan. I have to assign a PM anyhow...JR is best suited given the relationships.

did you already run that by Brendan?

JR was going to call him. Not sure if he did or not yet. I think he'll be good with it. JR will only be PM for Columbus and his own zones, which gives him the bandwidth to support you guys well

( TRANSFERRED TEXT MESSAGES )

LEADS ME TO
BELIEVE JR
IS DOING
WELL IN HIS
OWN ZONES

*Miller v. Duchene et al*
Complaint

# Exhibit J

OPERATING AGREEMENT
FOR
INSPIRED GREEN COLUMBUS, LLC

An Ohio Limited Liability Company

THIS OPERATING AGREEMENT, dated as of September 8, 2014, is between INSPIRED GREEN COLUMBUS, LLC (the "Company"), Inspired Marketing, LLC, a Michigan Limited Liability Company located at 216 S. Bridge St, Grand Ledge, MI 48837, BG & M, Inc., a Michigan Corporation located at 3193 Helen Rd, Mason, MI 48854, and John Robert Miller, residing at ███████████████ (known collectively as the "Original Members") and all those persons who shall hereafter be admitted as members of the Company (the "Additional Members"), by which the Company and the Original Member and Additional Members (collectively, the "Members") agree as follows:

ARTICLE I
ORGANIZATION

1.1  Formation. The Company has been organized as a limited liability company under and pursuant to the Ohio Revised Code 1705.04 (the "Act"), as amended by the filing of Articles of Organization ("Articles") with the Ohio Secretary of State as required by the Act.

1.2  Name. The name of the Company shall be INSPIRED GREEN COLUMBUS, LLC. The Company may also conduct its business under one or more assumed names.

1.3  Purposes. The purpose of the Company are to engage in any activity for which limited liability companies may be formed under the Act. The Company shall have all the powers necessary or convenient to affect any purpose for which it is formed, including all powers granted by the Act.

1.4  Duration. The Company shall continue in existence for the period fixed in the Articles for the duration of the Company or until the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Operating Agreement.

1.5  Registered Office and Statutory Agent. The Registered Office and Resident Agent of the Company shall be as designated in the Articles or any amendment thereof. The Registered Office and/or Resident Agent may be changed from time to time in accordance with the Act. If the Resident Agent shall ever resign, the Company shall promptly appoint a successor.

1.6  Legal Status of the Company. The Member(s) have formed the Company as a limited liability company under and pursuant to the Act. The Member(s) specifically intend and agree that the Company is not a partnership (general or limited), a corporation or any similar entity but is a limited liability company under and pursuant to the Act. No Member shall be construed to be a partner or shareholder in the Company or a partner of any other Member and the Articles, this Operating Agreement and the relationships created thereby and arising there from shall not be construed to suggest otherwise.

ARTICLE II
BOOK, RECORDS AND ACCOUNTING

6

JM066

2.1  Books and Records. The Company shall maintain complete and accurate books and records of its business and affairs as required by the Act and this Operating Agreement, including all addenda, and such books and records shall be kept with the Company's Statutory Agent as required by the Act.

2.2  Fiscal Year Accounting. The Company's fiscal year shall be the calendar year. The particular accounting methods and principles to be followed by the Company shall be selected by the Members from time to time.

2.3  Reports. The Company shall prepare reports concerning the financial condition and results of operation of the Company in the time, manner and form as the Member(s) and this Operating Agreement, including all addenda, determine. Such report shall be provided to the Member(s) or other designees at least annually, or as specified by this Operating Agreement and all addenda, as soon as practicable after the end of each fiscal year of the Company and shall include a statement of each Member's share of profits and other items of income, gain, loss, deduction and credit for such fiscal year or specified time frame.

2.4  Member's Accounts. Separate Capital Accounts for each Member shall be maintained by the Company, computed in the manner prescribed in the Act and under the provisions of the Internal Revenue Code of 1986, as amended (the "Code").

### ARTICLE III
### CAPITAL CONTRIBUTIONS

3.1  Initial Contributions. By the execution of this Operating Agreement, the Original Members hereby agrees to make the initial capital contribution set forth in the attached Exhibit A. By execution of their respective Admission Agreements (as defined in Section 9.1), each Additional Member agrees to make the initial capital contributions set forth in his or her Admission Agreement.

3.2  Additional Contributions. The Member(s) may determine from time to time that additional capital is needed to enable the Company to conduct its business and affairs. Notice of any such determination shall be given to all Member(s) in writing at least ten (10) business days prior to the date on which such additional capital is due. Such notice shall describe in reasonable detail the purposes and uses of such additional capital, the amounts of additional capital required, and the date by which payment of the additional capital is required. Each Member shall have the right (but shall not be obligated) to contribute that Member's pro rata share (based upon the Member's Sharing Ratio) of such additional contribution in order to maintain that Member's Sharing Ratio. If and to the extent that any Member does not elect to contribute that Member's pro rata share of the additional capital, then the remaining Member(s) may elect to contribute the amount of such additional capital according to their respective Sharing Ratios and in such event, the Capital Accounts and the Sharing Ratios of the Members shall be correspondingly adjusted.

3.3  No Interest on Capital/No Withdrawal of Capital. No interest shall accrue on any capital contributions made by the Member(s). No Member shall have the right to withdraw or to be repaid any capital contribution except as provided in this Operating Agreement.

### ARTICLE IV
### ALLOCATIONS AND DISTRIBUTIONS

JM066

4.1 **Allocations.** Except as may be required by the Code or this Operating Agreement, including all addenda, net profits, net losses, and other items of income, gain, loss, deduction and credit of the Company shall be allocated among the Member(s) in accordance with their Sharing Ratios.

4.2 **Distributions.** The Company shall make distributions to the Member(s) from time to time in such amounts and at such times as is determined by the Members. Distributions may be made only after the Member(s) determine in their reasonable judgment that the Company has sufficient cash in excess of the current and the anticipated needs of the Company to fulfill its business purposes (including needs for operating expenses, debt service, acquisitions, reserves and mandatory distributions, if any). Distributions shall be in cash or property, or partially in both, as determined by the Member(s). No distribution shall be declared or made if, after giving it effect, the Company would not be able to pay its debts as they become due in the usual course of business or the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy any preferential rights of other Member(s) upon dissolution that are superior to the rights of the Members receiving the distribution.

## ARTICLE V
## RESTRICTIONS UPON DISPOSITION OF MEMBERSHIP INTERESTS

5.1 **General.** No Member shall sell or otherwise dispose of or pledge or otherwise encumber all or any part of that Member's Interest in the Company unless with the prior written consent of the Company and each of the other Members. Any attempted sale or other disposition or pledge or other encumbrance without such consent shall be null, void and of no effect.

## ARTICLE VI
## VOTING RIGHTS OF MEMBERS

6.1 **Voting.** All Members shall be entitled to vote on all matters submitted to a vote of the Members, including, without limitation, those matters which must be submitted to a vote of Members pursuant to the provisions of the Act. Unless a greater vote is required by the Act, the Articles, or any licensing agreements the affirmative vote of the Members whose interests constitute a two-thirds majority of the Sharing Ratios of all the Members shall be required.

6.2 **Meetings.** Meetings of Members for any proper purpose or purposes may be called at any time by the Members whose interests constitute ten percent (10%) of the Sharing Ratios of all Members. The Company shall deliver or mail written notice stating the date, time, place and purposes of any meeting to each Member entitled to vote at the meeting. Such notice shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting. All meetings of Members shall be presided over by a Chairperson who shall be a Member so designated by the Members.

6.3 **Consent.** Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting, without prior notice, and without a vote, if consents in writing, setting forth the action so taken, are signed by the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members were present and voted. Every written consent shall bear the date and signature of

IM066

each Member who signs the consent. Prompt notice of the taking of action without a meeting by less than unanimous written consent shall be given to all Members who have not consented in writing to such action.

## ARTICLE VII
## MANAGEMENT

7.1  **Management Vested With Members.** The business and affairs of the Company shall be managed by the Member(s), with such management exercised by vote of the Member(s) in the manner required in Article VI. John Thomas Miller, acting on behalf of BG & M, Inc. will serve as the Managing Member overseeing accounting, insurances and compliance. John Robert Miller will serve as the Managing Member overseeing the Company's lead generation, project sales, and project installations. These management assignments will remain in force until determined otherwise by a written vote of the Members as specified in this Agreement. The Member(s) shall have the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company, including the power to: (a) purchase, lease or otherwise acquire any real or personal property; (b)sell, convey, mortgage, grant a security interest in, pledge, lease, exchange or otherwise dispose or encumber any real or personal property; (c) open one or more depository accounts and make deposits into and checks and withdrawals against such accounts; (d) borrow money, incur liabilities and other obligations; (e) enter into any and all agreements and execute any and all contracts, documents and instruments; (f) engage employees and agents, define their respective duties, and establish their compensation or remuneration; (g) establish pension plans, trusts, profit sharing plans and other benefit and incentive plans for Member(s), employees and agents of the Company; (h) obtain insurance covering the business and affairs of the Company and its property and on the lives and well being of its Members, employees and agents; (i) commence, prosecute or defend any proceeding in the Company's name; and (j) participate with others in partnerships, joint ventures, corporations and other associations and strategic alliances. (k) All business affairs, whether specified above or not, are subject to this Operating Agreement and all addenda. The Member(s) agree to uphold all specific provisions of the company's licensing agreement with Inspired Business Development, LLC (Exhibit B) in perpetuity.

7.2  **Standard of Care; Liability.** Every Member shall discharge his or her duties on behalf of the Company in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner which he or she reasonably believes to be in the best interests of the Company. A Member shall not be liable for monetary damages to the Company for any breach of any such duties except for receipt of a financial benefit to which the Member is not entitled, voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act, or a willful violation of the law.

7.3  **Reimbursement.** Member(s) shall be entitled to reimbursement from the Company for all expenses of the Company reasonably incurred and paid for by such Members on behalf of the Company.

## ARTICLE VIII
## EXCULPATION OF LIABILITY; INDEMNIFICATION

JM066

8.1 Exculpation of Liability. Unless otherwise provided by law or expressly assumed, a person who is a Member shall not be liable for the acts, debts or liabilities of the Company.

8.2 Indemnification. The Company shall indemnify each Member from and against any claims, losses, liabilities, damages or expenses (including attorneys fees) incurred by that Member as a result of or in connection with any pending or threatened legal proceeding (whether civil, criminal, administrative or investigative and whether formal or informal) in which that Member is made party or threatened to be made party as a result of his or her status as a Member of the Company or as an employee or agent of the Company, subject to the following limitations: (a) such indemnification shall not be applicable to any suit or proceeding brought by or in the right of the Company; (b) the right of the Member to indemnification is dependent upon the Member having acted in good faith, with the care an ordinarily prudent person in a like position would have exercised under similar circumstances, in a manner which the Member reasonably believed to be in the best interests of the Company and, with respect to any criminal suit or proceeding, the Member had no reasonable cause to believe that his or her conduct was unlawful; and (c) the right of the Member to indemnification shall not extend to any suit or proceeding based upon the receipt by such Member of any financial benefit to which the Member was not legally entitled, any suit or proceeding based upon the affirmative vote of the Member to any distribution to the Members in violation of this Operating Agreement or the Act or any suit or proceeding involving any willful violation by the Member of any provision of law. Where applicable, the Member's right of indemnification shall extend to any actual and reasonable expenses (including attorneys fees) incurred by the Member in connection with any suit or proceeding brought to enforce the obligations of the Company under this Section 8.2. Any indemnification permitted under this Article, unless ordered by a court of competent jurisdiction, shall be made by the Company only as authorized in the specific case upon a determination that the indemnification is proper under the circumstances because the Member has met the applicable standards of conduct and upon an evaluation of the reasonableness of expenses and amounts paid in settlement. This determination and evaluation shall be made by a majority vote (based upon respective Sharing Ratios) of those Members who are not party to or threatened by the suit or proceeding to which the claim for indemnification relates.

### ARTICLE IX
### ADMISSION OR WITHDRAWAL OF MEMBERS

9.1 Admission of Additional Members. No Additional Members shall be admitted to the Company unless with the written consent of all Member(s). The initial capital contribution of any Additional Member, and all other terms and conditions of admission shall be set forth in an Admission Agreement signed by the Company and the Additional Member. The Additional Member shall, in such Admission Agreement, agree to be bound by and subject to all terms and conditions of this Operating Agreement.

9.2 Withdrawal of Members. No Member shall be permitted to withdraw from the Company unless with the written consent of all Members. All terms and conditions of such withdrawal shall be as set forth in a Withdrawal Agreement signed by the Company and the withdrawing Member.

### ARTICLE X

JM066

### DISSOLUTION AND WINDING UP

10.1   Continuity of Life—Continuation of Company after Disassociation. Notwithstanding the death, withdrawal, expulsion, bankruptcy, or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company, the Company's business and affairs shall continue and shall not be dissolved or terminated, pursuant to and in accordance with the Act. If a Member who is an individual dies, or a court of competent jurisdiction judges a Member to be incompetent to manage his or her person or property, that Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering his or her property, including giving the consent required by this Operating Agreement or the Act for an heir, trustee, or successor to be admitted as a substitute Member. On a Member's withdrawal, expulsion, bankruptcy, or dissolution, the Company shall purchase, and the holder shall sell, the disassociating Member's Membership Interest in the Company at its book value, determined in accordance with generally accepted accounting principles consistently applied. The sale and purchase shall be completed within ninety (90) days of any such event.

10.2   Dissolution. The Company shall dissolve and its affairs shall be wound up on the first to occur of the following events only: (a) at any time specified in the Articles; (b) on the occurrence of any event specified in the Articles; or (c) on the unanimous consent of all the Members.

10.3   Winding Up. On dissolution, the Company shall cease carrying on its business and affairs and shall begin to wind them up. The Company shall complete the winding up as soon as practicable. On the winding up of the Company, its assets shall be distributed first to creditors, to the extent permitted by law, in satisfaction of Company debts, liabilities, and obligations (including those owed to Members). Thereafter, the assets shall be distributed as a liquidating distribution to the Members who have positive Capital Accounts, in accordance with such positive Capital Account balances, but only after the Capital Accounts have been adjusted for all prior contributions and distributions and all allocations under Article IV for all periods. The proceeds shall be paid to the Members within ninety (90) days after the date of the winding up.

10.4   Articles of Dissolution.   When all debts, liabilities and obligation of the Company have been paid, discharged or provided for, and then all remaining assets of the Company have been distributed, the Manager shall execute articles of dissolution in duplicate and cause the same to be filed with the Ohio Department of Labor and Economic Growth.

10.5   Liability After Dissolution.   Any Manager or Interest holder who, with knowledge of the Company's dissolution, subjects the Company to liability by an act which is not appropriate for winding up the Company's business, shall indemnify the Company to the full extent of such liability.

### ARTICLE XI
### MISCELLANEOUS PROVISIONS

JM066

11.1 Notices. Any notice permitted or required under this Operating Agreement shall be sent to the party at the address set forth in the records of the Company and shall be deemed to have been given on the date deposited with the United States Postal Service, postage paid, or when delivered in person or by courier or by facsimile transmission.

11.2 Binding Effect. Subject to the provisions of this Operating Agreement relating to transferability, this Operating Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

11.3 Governing Law. This Operating Agreement is being executed and delivered in the State of Ohio and shall be governed by, construed and enforced in accordance with the laws of the State of Ohio.

11.4 Entire Agreement. This Operating Agreement constitutes the entire agreement among the parties hereto and contains all of the agreements among said parties with respect to the subject matter hereof. This Operating Agreement supersedes any and all other agreements, either oral or written, between said parties with respect to the subject matter hereof. This Operating Agreement may be amended or revoked at any time by a written agreement executed by all of the parties to this Operating Agreement. No change or modification to this Operating Agreement shall be valid unless in writing and signed by all of the parties to this Operating Agreement.

IN WITNESS WHEREOF, the parties hereto make and execute this Operating Agreement intending it to be effective on the date first above written.

COMPANY:

9-8-14

INSPIRED GREEN COLUMBUS, LLC
n Ohio limited liability company

By: _____
JOHN THOMAS MILLER, on behalf of the State of Michigan
Inc. - it's Managing Member - Operations

MEMBERS:

9-8-14
Shawn Buell

9-8-14
Shawn Buell

_____
JOHN THOMAS MILLER
On Behalf of BG & M, Inc.

_____
JOHN ROBERT MILLER

_____
DENNIS J DUCHENE, II
On Behalf of Inspired Marketing, Inc.

JM066

EXHIBIT "A" TO
OPERATING AGREEMENT
INSPIRED GREEN COLUMBUS, LLC

Initial Capital Contributions/Sharing Ratios

| Member | Initial Contribution | Initial Sharing Ratio |
|---|---|---|
| BG & M, Inc. | $-20,000.00- | 50% |
| JOHN R MILLER | $-10,000.00- | 25% |
| INSPIRED MARKETING, LLC | $-30,000.00- | 25% |

COMPANY:

9-8-14

INSPIRED GREEN COLUMBUS, LLC
a Ohio limited liability company

By: _____
JOHN P MILLER, on behalf of
Managing Member - Operating

SHANE JACOBSON
Notary Public - Michigan
Oakland County
My Commission Expires Sep 8, 2019
Acting in the County of _____

MEMBERS:

9-8-14
Shawn Buell

9-8-14
Shawn Buell

JOHN R MILLER
On Behalf of BG & M, Inc.

SHAWN BUELL
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INDIANA
My Commission Expires Nov. 03, 2019
Acting in the County of _____

JOHN R MILLER

DENNIS J DUCHENE, II
On Behalf of Inspired Marketing

SHAWN BUELL
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INDIANA
My Commission Expires Nov. 03, 2019
Acting in the County of _____

JM067

**EXHIBIT B – MARKET ZONE TERRITORY ASSIGNMENT**
**LICENSEE: Inspired Green Columbus – Part of Columbus, OH CSA**
**EFFECTIVE DATE: September 7, 2014**

1. The following is a summary of exclusive territory for all services related to the Licensing Agreement executed between Inspired Business Development, LLC and Inspired Green Columbus, LLC as of the Effective Date listed above.  This territory encompasses two (2) complete Market Zones.

2. This territory is protected and set aside for Inspired Green Columbus, LLC as specified by the terms of the Licensing Agreement and comprises 90,000+/- qualified homes.  A qualified home is one that fits the following criteria in this market:

- Single Family, Owner Occupied
- Household income equal to or greater than $50,000 USD
- Household value equal to or greater than $100,000 USD

3. The zip codes included in this protected territory include, and are strictly limited to:

| | | | |
|---|---|---|---|
| 43015<br>9 070 results | 43062<br>738 results | 43068<br>9 757 results | 43209<br>5 127 results |
| 43081<br>14 293 results | 43013<br>287 results | 43224<br>1 078 results | 43235<br>9 168 results |
| 43074<br>2 619 results | 43011<br>1 606 results | 43110<br>6 866 results | 43065<br>12 252 results |
| 43082<br>8 988 results | 43230<br>13 145 results | 43112<br>1 286 results | 43130<br>8 453 results |
| 43021<br>3 444 results | 43213<br>2 212 results | 43219<br>1 148 results | 43240<br>742 results |
| 43035<br>6 821 results | 43105<br>2 040 results | 43136<br>255 results | 43085<br>5 419 results |
| 43054<br>5 548 results | 43004<br>6 651 results | 43231<br>2 940 results | 43016<br>9 095 results |
| 43031<br>3 202 results | 43147<br>11 439 results | 43125<br>2 249 results | |
| | 43227<br>206 results | 43103<br>2 147 results | |
| | 43232<br>2 005 results | 43229<br>5 154 results | |

JM075

The following maps show the protected region in its entirety:



4. Inspired Green Columbus, LLC is not approved to conduct business under the Licensing Agreement in any other market segment beyond this protected service territory. Any territory that isn't protected for another Powered by Inspired Green licensee is open for normal solicitation. If, however, another Powered by Inspired Green licensee has claim to protected status in any territory, Inspired Green Columbus, LLC understands that it is prohibited from active solicitation in said territory under the terms of its Licensing Agreement. Inspired Green Columbus, LLC acknowledges the perpetual nature of this agreement as well as the strict limitation placed upon it with regard to the offer of any home upgrade service outside of this Agreement.

We, the undersigned, affirm and accept the terms as documented above.

_9-17-14_   _9/17/2014_

On Behalf of Inspired Green Columbus, LLC

On Behalf of Inspired Business Development, LLC

Title and Printed Name:

Title and Printed Name:

JM075

*Miller v. Duchene et al*
Complaint

# Exhibit K

**Inspired Business Development**
**2015 Year End Update – 12.21.2015**

The following is an update on the status of Inspired Business Development, LLC that takes a lot of context into account. The layout is designed to be as straight forward and readable as possible, offering a bullet pointed summary of events by pertinent quarter. We have some very important decisions to make and the goal here is to acquaint every stake holder with a simple presentation of the details. Please let me know if you have any questions or require further clarification on any matter.

**2012 – 2013**

It is important to consider some details that have direct daily bearing on the business, but were generated in 2012 and 2013. Here's a list of relevant points to understand:

**2012**

- In 2012, Inspired Marketing, LLC booked approximately $6.5 MM in revenue, but incurred approximately $2.5 MM in debt comprised of a combination of private lender liabilities ($2 MM +/-), State of Michigan tax liability (originally $140K +/-), Federal tax liability (originally $400k +/-), and liabilities to two major vendors (Sears/Service Concepts)
  - These liabilities were created by operational shortfalls in both revenue generation and cost controls
    - We lacked clear financial visibility and were operating off of bad reporting and accounting assumptions much of the time
    - We scaled overhead, primarily based upon a desire to drive revenue up and with the wrong metrics for cost management
    - At no point, until the reporting errors became very clear in the last quarter of 2012, did we think that lenders or vendors were at risk of not being paid off by the end of the first quarter of 2013
  - Both of these scenarios were driven almost entirely by Inspired Green's participation in large scale utility programs, with low transactional revenue and high administrative burden
    - 2012 saw a shift within which Inspired took on a lot of program management responsibilities that it hadn't controlled in the past, such as large scale inventory purchasing and management
    - 2012 program performance failed to meet the minimum production goal
    - 2012 saw hundreds of thousands of dollars of loss of payments from these programs
      - Approximately $400,000 in revenue was lost due to relationship dynamics between Inspired and CLEAResult, the utility's primary contractor
      - Approximately $600,000 in revenue was unearned due to poor field performance as compared to previous years
    - In short, our eyes were bigger than our stomachs and we grew too quickly for our skill and experience, resulting in breakdowns that hadn't happened in our first three years of working in this space

**2013**

- 2012 losses forced us to restructure the operational model on the fly, entering 2013 with a complete withdrawal from utility direct installation programs and an exclusive focus on retrofit installations
- Our staff shrank from as high as 200 in 2012 to 30 or so in 2013
- A Board of Advisors was convened from among the private lenders
- The company's cash flow was under immense strain due to the need to service tax liabilities, contractor and vendor liabilities, and the fact that $400,000 in invoiced work was not able to be collected
- Jay Messner did an admirable job keeping stake holders informed and engaged
- The company generated approximately $2.5 MM in retrofit revenue that wasn't a carry-over from 2012, and operated at a $150k +/- loss
  - The loss was driven by the fact that we retained a number of positions on payroll that were not necessary to the operation, but that we believed would be necessary based upon the recovery plan we were attempting to implement



- A recast P/L, removing unnecessary payroll, results in a net profit slightly higher than 15%
  - The recovery plan was severely constrained by the immense debt and the highly constricted cash flow
    - Our balance sheet made it impossible to attract new funds in the form of properly structured financing or investments
    - Our cash flow was so constricted that, despite generating $50k per week, our payment load consistently outpaced what we brought in, resulting in a stagnation of attempted growth
  - The revenue that was generated demonstrated the company's continued ability to meet needs at a profit
- After a careful evaluation of the situation, and having a strong desire to fight through the issues as opposed to giving up, I proposed a shift to a model within which Inspired Green would license its successful systems to contractors in the same market segment, which was supported by the Board of Advisors
  - In November of 2013 we split off the Michgan markets and sold them to Ian Mattoon, one of the company's best performing sales consultants, and JR Miller, the company's sales manager
    - Ian Mattoon established Inspired Green West (IGW)
    - JR Miller established Inspired Green East (IGE)
    - IGW launched well in terms of sales, generating more than $500,000 in revenue in its first operational year
      - IGW "bootstrapped" its launch, with Ian playing all roles
    - IGE didn't have a successful launch, but was able to secure SBA financing for its purchase fee of $75,000 as well as a launch fund of $75,000 in early 2014
      - JR, unlike Ian, didn't get into the field and, therefore, didn't generate revenue
- 2013 finished up with Inspired Marketing officially out of a contracting role and, instead, in an operational support role for the two pilot licensees
  - This process allowed for a significantly lower overhead profile and, potentially, more scalable growth without construction liability being associated with the company

## 2014

- Q1 (Jan – Mar)
  - Inspired Marketing entered the first quarter of 2014 with a radically reduced staff of 8 individuals and streamlined overhead
  - The first quarter was focused on finalizing the licensing concept, determining other revenue lines that would be viable, and negotiating with vendors/tax agencies in light of the new business structure
  - Cash flow continued to be highly constricted, slowing the growth rate and profitability of the business
  - The Inspired Marketing balance sheet was still in very bad shape, eliminating the option of securing funding from outside sources
- Q2 (Apr – Jun)
  - Inspired Marketing was being pressured by its two largest vendors, as well as two insurance company law suits and a law suit from a private lender, to the point that we had no operational cash flow slack
  - I proposed a new business structure to the Board of Advisors that involved Inspired Business Development, LLC, a company that I formed in mid-2012 to launch training and licensing services, purchasing the assets and good will of the Inspired Green brand from Inspired Marketing for a fixed price of $500,000, which we determined to be fair market value, with $200,000 of this due in the first 12 months of IBD's operations
    - This move would allow us to stop operations under Inspired Marketing while giving creditors and tax agencies a clear plan for repayment of their claims up to the fair market value of Inspired Marketing's assets
    - The move would also allow a new company to build an unrestricted positive balance sheet, allowing for new funding sources and opportunities
    - Equity would be offered in the Inspired Business Development to each of the private lenders with liabilities outstanding to Inspired Marketing in exchange for the elimination of accrued interest on their liabilities and a forbearance on any accelerated claims against Inspired Marketing for their loan balances, which would force a bankruptcy for the company and myself

②

- Creditors understood that Inspired Marketing's only revenue would be paid to it by IBD and that the total value of the purchase agreement was capped
- The Asset Purchase Agreement was supported by the Board of Advisors and, as of July 1, 2014, Inspired Business Development became the entity that owned the Inspired Green brand, the good will associated with the company, and the physical assets of the business that weren't transferred to IGW and IGE in the 2013 sale
- I became the sole member of Inspired Marketing as of July 1, 2014
  - Most of the private lenders became equity holders in IBD as of July 1, 2014
  - Inspired Marketing's previous equity investors transferred to IBD and released their equity in Inspired Marketing
    - By the end of Q2, Inspired Marketing had a loss of -$51k
- Inspired Marketing Q3/Q4 (July – Dec)
  - IBD paid off more than $250,000 of its liability to Inspired Marketing in the last two quarters of the year
  - These funds made it possible for Inspired Marketing to service its tax liabilities and other critical creditor collections without being forced into bankruptcy
  - Inspired Marketing won a dismissal of a judgement for $100,000 from Auto Owners Insurance over this time period as well
- IBD Q3 2014
  - IBD launched its licensing service in July
  - By Sept 30, the company had generated $174K in revenue on a cash basis, and $516K on an accrual basis (franchise fees under license but not yet collected)
  - A net profit of $23k on a cash basis (with my pay being included in the expenses) was generated, making this the first profitable quarter since 2011
  - One major accomplishment was when Mark Group, a large Philadelphia based contractor with a 5 state footprint, joined the licensing system
  - The cash flow was still very constrained because nearly $100,000 was paid to Inspired Marketing, forcing IBD to operate as if was running at a loss of -$70k despite its successful launch
  - Cash flow constraints caused internal concerns in the minds of the staff and had a significant, direct bearing upon the ability to execute
  - The clean balance sheet of IBD allowed for discussions with many individuals who were interested in investing or partnering with a new franchise concept
  - Inspired Green East (JR Miller) began to have very serious operational problems because his company was not producing appointments for sales staff and his SBA funding was being used up
  - Inspired Green West (Ian Mattoon) continued to sell at a significant rate, generating revenue share for IBD and underscoring the strength of the model
  - The sales of licenses underscored the market perspective of Inspired Green and was a solid validation of our system
  - We began hiring operations staff to support the growth of the franchise market place
- IBD Q4 2014
  - IBD had revenue of $224k on a cash basis in Q4, with a cash basis loss of -$3k
    - This loss was due to two factors
      - Our staff costs increased by 80% over Q3 by necessity, as we ramped up admin to support new sales growth
      - We lost all projected revenue share from Mark Group (expected $60k) in the month of December
        - The company, which was part of a parent company in the UK, was shut down without warning due to the loss of the Parent Company's major long term contract in England...Mark Group UK went from being flush with cash to being purchased out of receivership with all overseas operations shut down within 3 months
    - We generated $310k in this quarter on an accrual basis
  - The sudden, unpredictable loss of Mark Group resulted in a significant cash flow blow to the company

③

- More than $120k was paid to Inspired Marketing over this period to keep creditors in the right mind frame, forcing Inspired Business Development to operate as though it had a cash loss of -$123k
    - This caused a back log in payroll taxes at IBD in the amount of -$30k +/-
- IGW (Ian Mattoon) suddenly hit an operational wall and began to move backward in his performance

**2015**

- **Q1**
    - Mark Group's sudden departure left a big cash flow hole, amounting to more than $330k in owed franchise licensing fees and projected revenue share of approximately $60k per month from operations already being supported by the licensed system
    - I decided that the best way to overcome this major setback was to seek individuals or entities who would be interested in investing in start-up versions of the franchise that would benefit from the licensing fees already paid by Mark Group
        - While Mark Group was imploding, we reached out to the utility programs in their areas and asked if we could step into the place of Mark Group as participants
            - This was mainly greeted with approval, which caused us to recruit Mark Group staff with the intent of raising funds and keeping these experienced people in the field without much disruption
            - Unfortunately, the utilities reconsidered this, and required all operations to be launched as new applicants to their programs, effectively ending our ability to simply step into the momentum we'd already built with Mark Group
            - This meant that we needed to launch start-up operations in each Mark Group territory that we found investors to fund
                - Our system was initially designed to support contractors who were already in operation
                - This was adding layers of complexity that we didn't anticipate, but that we couldn't avoid
        - Abby Feinstein, formerly of Mark Group and now serving as IBD's Director of Operations, did an amazing job finding more than 10 individuals in her network who were willing to step into a new set of LLC's under the joint operation of a new company called Catalyst Building Performance, basically assuming Mark Group's licensing fee balance of $330k
            - Catalyst Building Performance paid approximately $300k against these fees in Q1, allowing the company to generate $328k on a cash basis, and to post a net profit of $89k in the quarter (with my pay included in expenses)
            - We all knew that this was a band aid and that revenue share from the licensed territories was an absolute necessity to grow, if the team was going to be maintained
            - The biggest constraint was the fact that our team was now being tasked with the recruitment, training, and deployment of more than 22 licensed markets simultaneously
            - Catalyst, through one of its key investors and Board members, Ray Soly, also purchased the rights for several other market territories
        - Cash flow was a serious problem at this point, as more than another $60k had been paid into Inspired Marketing, causing the accumulated cash flow impact of the payments to Inspired Marketing to force IBD to operate like it had a loss of -$240k +/- on a cash basis, as opposed to having reserves of $102k that had been earned by this time
            - Payroll tax liabilities increased to approximately $70k by this time, and we were already in discussion with the State of Michigan and IRS to resolve these items
                - Both entities were fully aware that payments to Inspired Marketing, which were being almost entirely used at this point to service 2013 tax liabilities, were driving IBD's growing tax bill
                - Our staff also voluntarily deferred their payroll for the month of March, causing a liability in the $40k range to build there as well
            - IGE and IGW were functionally a mess by this point

(4)

EXHIBIT E - Page 100 of 121

- o JR Miller simply never launched his business and, additionally, had purchased another market license with his father, John Miller, in Columbus, OH...another market where they never actually took the final steps to launch
- o Ian Mattoon was under a lot of pressure due to poorly installed workmanship and administrative gaps in his operation, resulting in Consumers Energy, one of our best partners in Michigan, determining to remove his company from their program
- o Their performance caused me to further question the idea of a franchise for our system...they were long standing operators at Inspired Green and they failed to execute on what I believed to be a highly documented system
- o In summary, Q1 resulted in solid earnings, broken cash flow, and a decreasing ability for our team to operate as it was in 2014
- o IBD's balance sheet now had a couple of black eyes, but they could be put into context and, therefore, we were still in a better position than we had been before the purchase from Inspired Marketing
- o We made the decision in Q1 to avoid selling any additional licenses, as it was clear that we had a major hill to climb with the ones we already had
- • Q2
  - o We started Q2 with one simple reality...if we didn't start generating revenue share from our existing licensed territories, we were looking at a major restructure
  - o The staff had already been deferring compensation for a month and, at this point, I made the decision to offer them all the opportunity to continue to invest in the deployment of markets, but as 1099's with their payables deferred until such a time that the company can reasonably pay, or to take a lay off
    - ▪ Almost all of the staff chose to stay in, believing that we were very close to successfully getting market zones launched
  - o April saw almost no revenue and a loss of -$25k on a cash basis
  - o By the end of April many of the team decided, rightly, that they needed to make a change and we were left with just a few individuals driving things forward
  - o By the end of the quarter, Mike Davis, Mike White, and I were the three left, with Jacob Sebrell fulfilling audits on a limited basis
  - o The upside is that our overhead got even smaller and our revenue, after April, started growing again because we terminated IGE and IGW licenses and began selling retrofits again, deploying our first functional Pod in Plymouth, MI
  - o The downside is that we took on more debt to stay alive in April, taking on high cost capital against the remaining franchise fees owed to us from Catalyst Building Performance
  - o We decelerated the rate at which we were paying Inspired Marketing as a matter of survival, with new installment agreements being created with the State of Michigan and IRS that gave us a little room to breathe
  - o The quarter ended with a total of 5 employees on the payroll, two of whom were sales people being paid only when they sold, $99k in revenue on a cash basis and a net loss of -$20k on a cash basis, all of which was incurred in April
  - o We didn't incur any additional payroll taxes, but the new debt against receivables was $72k, taking our total debt to around $140k, and structured in a really painful format, including daily ach payments to the creditor of around $600, for a total of $18k per month in debt service alone
  - o During this time, we requested permission from the Catalyst Building Performance group to focus on a single pod in 5 markets, including three in MI, one in OH, and one in MD, which was approved
- • Q3
  - o We generated $133k in revenue on a cash basis in Q3 with a net profit of $23k, just under half of which came from Ray Soly funding another major portion of Catalyst Building Performance's licensing fees
  - o Our additional revenue came from selling home performance directly in the territories that were formerly controlled by IGE and IGW
  - o We paid an additional $12,500 to Inspired Marketing, resulting in total payments of more than $315K from IBD to IM within 14 months, which had a dramatic negative effect on IBD's ability to maintain its momentum, forcing it to operate like it had a sustained net loss of -$240k+



- Q4
  - We knew that we didn't want to give up on the licensing concept…we just needed to think through how to make it less costly to existing contractors to participate and we needed to provide services in the areas of our maximum strength; marketing and sales
  - The key to Q3 was to develop a model that would allow us to leverage a scaled down version of the Pod model and to get out of the installation business again
    - This led me to create the Snug Home model
      - Snug Home allows IBD to act as the client acquisition engine for a utility program; we generate the leads, sell and conduct audits, then sell a Scope of Work to the home owner
      - We keep 50% of the revenue from the sold retrofit project, which is all collected up front, but we immediately assign the contract to a participating contractor
        - The legal agreement is then fulfilled between the assigned contractor and the home owner
        - IBD acts on the home owner's behalf, designing an unbiased Work Scope and testing the contractor's work after it is completed
      - We use the same pricing model as always, meaning that we make an average of $2000 per project, pay the sales and marketing costs, and net around $900 per project without any liability or management for installation
    - We formally launched Snug Home in a test phase in the Metro Detroit market on Oct 1
      - Our goals were to generate a minimum of $1250 per day in revenue to IBD during the test period and to get utility approval on the format in Michigan (Consumers and DTE Energy), Ohio, and Maryland
      - The program included building a call center in the Grand Ledge office for direct management, and deploying in a manner that would generate a minimum of 2 – 3 appointments each day for Mike White, the consultant for the test
      - As of 12/15/2015, here are the results of the test:
        - Successfully generated 118 appointments for Mike White
        - Mike generated a total of $99k in gross sales, with $1551 in collected funds for a daily average
        - 100% of the appointments were generated by 2 Full Time Equivalents in the call center
        - The call center staff are all supplied by a temporary agency, eliminating excess overhead and administrative responsibility
        - The approvals were secured by utility providers in both Michigan and Maryland, allowing us to expand the program as we desire in 2016
  - Ray Soly funded another payment of $60k against Catalyst Building Performance's licensing fee, bringing its balance down to a total of $35k
  - IBD was able to help launch a non-profit partner, GLES, in a low income utility program at the urging of CLEAResult, allowing IBD to sell excess inventory to the non-profit for $10k as well as generating an invoice for a $20k licensing fee and ongoing revenue share of 12%
    - GLES staff performed very well on the Q4 initiative, which is being wound up this week
    - GLES how has a contract for 2016 that will total between $300k and $600k for low income installation services, yielding between $36k and $72k for IBD
  - Total revenue to date in Q4 has been $143k, with another $25k in transactions that should clear before the end of the year
  - At present, Q4 shows a net profit of $9500, which will slightly increase by years' end
  - Cash flow is in the negative at the time that I am writing this, with the holiday amplifying the impact
  - We are potentially going to have to take another draw on the high cost credit lines to continue to survive into Q1 2016, despite the progress, adaptivity, and profitability of IBD in 2015
  - The company will post a net profit that is between $75k and $100k this year despite the hurdles, but its cash flow is that of a company running with a nearly -$300k loss due to the fact that it's payed Inspired Marketing entirely out of operational cash flow as opposed to 3rd party financing



**Summary and 2016 Goals**

- IBD, by any objective standard, has demonstrated resilience in the midst of serious economic hardship. This is primarily a function of our ability to creatively adapt while leveraging systems that we've proven work. We've been operating since day 1 with a tremendous anchor tied to us in the form of the $330k that has now been paid to Inspired Marketing, and, as such, applied to its debt.
- In a perfect world, IBD will be able to secure 3rd party financing to restructure $170,000 in debt and past due taxes for the purposes of being able to run without these constant massive cash flow hemorrhages.
- If IBD has the ability to restructure its debt and it can invest cash flow into growing the Snug Home model, the company can survive and thrive, yielding returns to its investors in the first quarter of 2016.
- If IBD cannot restructure its debt and reinvest its cash flow into stable operations and growth of the Snug Home model, we may not see the other side of the 1st Q of 2016, as our deficit will grow due to the nearly $20k per month we are currently paying for debt service and taxes

I recommend that all stake holders associated with IBD or Catalyst Building Performance, which now holds 100% of the "for profit" licensed territory, consider ways to replace IBD's debt with something reasonable, allowing much needed air to flood the lungs of the suffocating company. It would be heart breaking for me personally to see what I've fought for, on all of our behalves, simply flame out at this point. We are in a great position to grow our revenue streams in Michigan, Ohio, Maryland, and Pennsylvania in 2016 through the Snug Home model if we simply get some space to move.

Thanks to all of the staff members who went TWO MONTHS OR MORE without being paid to try to help us make the turn. Literally, there are still tens of thousands of dollars that need to be paid to these committed, excellent people. Connie Rulison, Stewart Boner, Abby Feinstein, Jake Flanders, Jake Sebrell, Dennis Smith, Denny Sr, Jonathan Smith, and, OF COURSE, Mike Davis and Mike White stood under immense weight emotionally and financially. I can't even express how much that meant to me personally.

I want to thank Ray Soly specifically for being such an amazing advocate for the companies this year. His commitment of funds and wisdom to the Catalyst side of the relationship allowed us to survive and reposition. Thanks, Ray, for your friendship, guidance, push back, and support. Thanks, as well, to all other investors in Catalyst who stepped into something that you knew was…fluid…I hope 2016 can offer a significant upside for all of you.

Here are our 2016 goals, if we can continue to slug our way through this:

1. Restructure the debt to something reasonable and manageable for the company's cash flow
2. Pay no more than $80k toward the remaining $170k of IBD's purchase agreement with Inspired Marketing
3. Help Inspired Marketing launch up to three Pods under the Snug Home model, thereby opening up its own cash flow to continue to service its debt
4. Help GLES expand its non-profit activity to a baseline of $1 MM in low income utility services, thereby yielding $120k to IBD
5. Expand Snug Home in Lansing and Oakland Counties in Michigan to a level that is generating $2.5 MM in gross retrofit sales, yielding $1.25 MM to IBD
6. Expand Catalyst's Snug Home programs in Grand Rapids, MI, North Macomb County, MI, Frederick, MD, Columbus, OH, and Pittsburgh, PA to a combined $2.5 MM, thereby yielding $1.25 MM to Catalyst, and $150,000 in revenue share to IBD
7. Distribute a minimum of 10% of principal invested to all individuals who participated financially in the IBD platform

All of these are reasonable, achievable, and directly in line with what Inspired has historically accomplished. We just need to figure out the short term strategy. If you are willing to discuss this, please let me know asap. We will schedule a video/telephone conference call as soon as possible…preferably in the week between Christmas and New Year's Day.

Denny Duchene



*Miller v. Duchene et al*
Complaint

# Exhibit L



≡          **Catalyst (http://catalystholdingsllc.com/)**



POWERED BY:

# REAL PEOPLE INVESTING WITH REAL PURPOSE

Catalyst has partnered with Inspired Green (www.goinspiredgreen.com) to develop an opportunity for ordinary individuals to invest as silent partners in the expansion of proven service business. **Inspired Green serves the 85% of American families\*** whose homes contribute to a compromised quality of life in the areas of health, safety, comfort and finances.

You're probably familiar with investment opportunities such as stocks, bonds, 401Ks and mutual funds. These investments are designed to deliver financial returns after a lifetime of continued, incremental investment, mainly to support retirement. You give your financial planner a certain amount of money and you have no real connection with what you're investing in. In contrast, this is an opportunity to see your money work in a tangible way. You watch your investment create real jobs, real impact on the quality of life of families, and real potential for high, short term returns. This investment can help families, including your own, this year.

**If you have interest, and you answer "yes" to the following questions, dig deeper.** This may be a great fit for you and your family.

- Do you think that small businesses play an important role in our economy?
- Do you like the idea of helping families while addressing the increasing concern for their indoor air quality, structural safety, and lowering the cost of energy?
- Do you like the idea of investing in something that you can watch be built from the ground up?
- Do you have $7500 - $8000 that you can invest in direct partial ownership in a business being managed by a team of experts on your behalf?
- Are you comfortable with the risks associated with a small business start-up in exchange for the potential rewards of high returns (target of 20% within the first 12 months) on your investment and actual, significant ownership in a tangible business?

**Yes? For more information on this opportunity, please contact Jake Flanders:**

jflanders@catalystholdingsllc.com | 616.277.7243

*Sources include: 2013 Harvard JCHS Remodeling Report, National Association of Home Builders citation of 2012 Eye on Housing Aging Report, The DOE's Introduction to Home Performance with Energy Star by Jason Bogovitch , and the DOE's History of the Weatherization Assistance Program

Home (/) » Opportunities

Opportunities (/opportunities/)

Home (/) » Opportunities

**Home (/)**
**Opportunities (/opportunities/)**
**Who Are We? (/who-are-we/)**
**Contact Us (/contact-us/)**

©2015 Catalyst Holdings, LLC. All rights reserved.



## Catalyst (http://catalystholdingsllc.com/)

*cat·a·lyst*: A "change agent" that stimulates increased energy, momentum, or effectiveness without being consumed in the process.

## CATALYST AT A GLANCE

Catalyst Holdings, LLC ("Catalyst") was organized in mid-2014 by **a group of like-minded entrepreneurs** for the purpose of launching or growing **businesses that make a difference** in the quality of life of the people they serve. The team's goal is to create a meaningful and powerful partnership between **real people and real small businesses**, making skilled jobs available in local communities and around the nation. We are constructing a **new economic engine** built of ethics, transparency, equality, innovation, and community.

## REAL PEOPLE REAL PURPOSE

Catalyst is designed to allow **REAL PEOPLE** to invest in **REAL BUSINESSES** with **REAL PURPOSE**, creating employment, opportunity and economic growth without waiting for big business or the government to do it for us. When we say **real people** we mean the kind that most of us are.  We have day jobs…we have families…we have a house payment, and a budget, and a car payment and we want to live productive lives that leave a mark. Most of us aren't multi-millionaire venture capitalists or celebrities. Ultimately, **real** means **authentic**.

## Catalyst's Business Development Pipeline concentrates on two kinds of activity that are funded by investors:

### New Ideas:

Catalyst will designate 25% of all funds committed to the development of start-up ideas that are submitted by REACTOR GROUPS and online submissions.

### Aquisitions:

REACTOR GROUPS will also "bird dog" unique opportunities to acquire businesses that fit Catalyst's target Platforms, as defined below, with a specific emphasis on small businesses whose owners have built something worthwhile, but are ready to shift into a non-operating role while benefitting from retained

equity and regular, defined dividend payments

The Catalyst model is all about identifying **innovative start-up** concepts or **strategically positioned** existing businesses.  Then, our goal is to acquire and develop each opportunity to its **greatest potential** by providing a unified set of **cultural values** and operational **systems**. The companies will be split up into **PLATFORMS** (defined below).   In the process, we'll connect our **investor community** to each platform while offering **protections** and **transparency**.

Here are our **Core Values**, which will form the heart of our community across all Start-Ups and Acquisitions:

- **Productivity:**  Catalyst will focus on efficiency and excellence in each Platform, using best practices that offer maximum positive impact for our clients, investors, and employees
- **Responsibility:**  Catalyst will choose business opportunities that enhance the quality of life of the end user with an emphasis on environment, justice, and personal growth
- **Integrity:**  Catalyst is committed to a culture of honesty, directness, mutual respect, and follow through at every level of our team and in every interaction with our clients and investors
- **Diversity:**  Catalyst believes that our team is at its strongest when we intentionally and rigorously build our community with people from diverse gender and racial backgrounds
- **Empathy:**  Catalyst believes that treating others as we want to be treated is the ultimate show of humanity and respect and that a commitment to mutual understanding will always produce the greatest outcome

Home (/) » Who Are We?

Who Are We? (/who-are-we/)

Home (/) » Who Are We?

**Home (/)**
**Opportunities (/opportunities/)**
**Who Are We? (/who-are-we/)**
**Contact Us (/contact-us/)**

©2015 Catalyst Holdings, LLC. All rights reserved.

*Miller v. Duchene et al*
Complaint

# Exhibit M



John Miller <​███████████████​>

## Fwd: LLC Doc
1 message

**JR Miller** <jrmiller@goinspiredgreen.com>
To: John Miller <​█████████████​>
Wed, Jan 21, 2015 at 7:40 PM

Dad,

I asked Denny if he would have a document drafted so you could see this in writing. I know you said you need to think about this, but there are time-constraints around the decision.

1. The new investor (I do not know who this is) in the IG Market Zones in New Jersey would like to do this in one transaction vs multiple transactions. The investor is signing documents tomorrow and sending funds shortly after. The investor would like to be able to sign all documents and send the funds at the same time if he/she is buying into Columbus so your decision is time-sensitive.

2. **Take the deal.** Even if things blow up and boat loads of money is made, I think you and I are better off relationally if you let Denny buy back your share of the company. I'll share my portion of the profits with you. I don't care about the money. There are a thousand different things we can spend our time doing together other than this. This venture has pushed us farther apart rather than bringing us closer.

I know you don't want to be pressured into making a decision, but the opportunity to get your money back may disappear quickly if it's not acted upon.

Please let me know as soon as you can.

---------- Forwarded message ----------
From: **Denny Duchene** <dduchene@inspiredbd.com>
Date: Wed, Jan 21, 2015 at 6:08 PM
Subject: LLC Doc
To: JR Miller <jrmiller@goinspiredgreen.com>

Here you go



**JR Miller | 517-321-4935 ext 840**
Inspired Green | jrmiller@goinspiredgreen.com
**Solid Ethics. Unparalleled Quality. Steadfast Unity. Candid Dialogue.**

*If this note is brief, please pardon the brevity. Here's why I keep it short: http://emailcharter.org/*



https://mail.google.com/mail/u/0/?ui=2&ik=a71dad75fd&view=pt&cat=inspired%20green      2/28/2015  IM071

**BG M LLC MEMBERSHIP PURCHASE AGREEMENT.pdf**
45K

## LLC MEMBERSHIP PURCHASE AGREEMENT

**1.  Introduction.**  The following terms and conditions contain and define the entire Agreement to Purchase ("Agreement") between BG & M, Inc, a Michigan Corporation located at 3193 Hulett Rd, Mason, MI  48854 ("Seller") and Catalyst Holdings, LLC, a Michigan Limited Liability Company located at 10555 S Wright Rd, Eagle, MI  48822, also referred to collectively herein as the "Parties".

**2.  Property Definition and Rights.**  Seller wishes to sell and Buyer wishes to acquire a 51% Sharing Ratio in Inspired Green of Columbus, LLC ("Company"), an Ohio Limited Liability Company.  Seller testifies hereby, and as defined in the Company's Operating Agreement, that this Sharing Ratio constitutes Seller's entire ownership in Company and that Seller has all legal rights and approvals to dispose of this property according to the terms of the Company's Operating Agreement. This disposition includes:

   **a.**  Seller's total claim of rights and benefits related to the Company, its products, or its earnings, which will be transferred in their entirety to Buyer with no further claim from Seller, its assignees, its heirs, its trustees, nor any other affiliate of Seller.

   **b.**  Any liabilities associated with Seller's Sharing Ratio in the Company, which Seller also transfers to Buyer in its entirety.  Buyer promises and commits to indemnify and hold Seller harmless in all matters related to the transfer or future operation of this Sharing Ratio and such commitment extends to Buyer's assignees, heirs, and trustees as associated with this Sharing Ratio.

**3. Consideration.**  Seller agrees to accept, and Buyer agrees to pay, a total purchase price of $21,000.00 USD in total satisfaction and exchange of 100% of its Sharing Ratio in the Company with absolutely no future consideration or claims of further compensation for Seller, its assignees, its heirs, its trustees, nor any other affiliate of Seller.

**4. Payment Terms.**  Seller agrees to accept, and Buyer agrees to pay, $6000.00 USD at the execution of this Agreement, which serves as its Effective Date.  Buyer will issue further payments of $3750.00 USD to Seller in four (4) monthly installments, with the first installment being paid thirty (30) days after the Effective Date and each successive installment being paid in thirty (30) day increments thereafter until the entirety of the sum is paid in full.

**5.  Remedies and Governing Law.**  Both the Seller and the Buyer do hereby testify to their mutual willingness to abide by the terms and conditions herein.  Any perceived breach of this Agreement, in whole or in part, will result in a written Notification to Cure to the opposite Party.  The Party will have 30 days to cure the breach or to respond with a challenge.  Any disagreement that is not able to be resolved between the Parties will be subject to the jurisdiction, laws, and Courts of the State of Michigan.

**6.  Entire Agreement.**  The Parties agree that this Agreement constitutes the entire agreement between the Parties and that this Agreement has authority over any previous written or implied agreement.  Furthermore, the Parties testify that no other agreements exist between them that may countermand or challenge this Agreement.

**7.  Severability.** Any provision of this Agreement that may be struck down or ruled invalid by a Court of legal jurisdiction does not imply or undermine the enforceability of all remaining provisions. The Parties agree that all terms and conditions which remain intact or unchallenged will have permanent Binding Effect upon them and their assignees, heirs, affiliates, and trustees.

**SIGNATURES**

_____

Name

On Behalf of BG & M, Inc

Title:_____

Effective Date:_____

_____

Name

On Behalf of Catalyst Holdings, LLC

Title:_____

Effective Date:_____

*Miller v. Duchene et al*
Complaint

# Exhibit N

CSCL/CD-700 (Rev. 01/14)

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU

| Date Received | (FOR BUREAU USE ONLY) | |
|---|---|---|
| JUN 2 0 2014 | This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document. | **FILED** JUN 2 3 2014 ADMINISTRATOR CORPORATIONS DIVISION |

Name  ANN DUCHENE

Address  10445 S. WRIGHT RD

City  EAGLE   State  MI   ZIP Code  48822

EFFECTIVE DATE:

Document will be returned to the name and address you enter above.
If left blank, document will be returned to the registered office.

## ARTICLES OF ORGANIZATION
## For use by Domestic Limited Liability Companies
(Please read information and instructions on reverse side)

E4673H

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Articles:*

**ARTICLE I**

The name of the limited liability company is:  CATALYST HOLDINGS, LLC

**ARTICLE II**

The purpose or purposes for which the limited liability company is formed is to engage in any activity within the purposes for which a limited liability company may be formed under the Limited Liability Company Act of Michigan.

**ARTICLE III**

The duration of the limited liability company if other than perpetual is: _____

**ARTICLE IV**

1. The name of the resident agent at the registered office is:  ANN DUCHENE

2. The street address of the location of the registered office is:

   10445 S. WRIGHT RD   EAGLE , Michigan  48822
   (Street Address)          (City)                              (Zip Code)

3. The mailing address of the registered office if different than above:

   SAME , Michigan _____
   (P.O. Box or Street Address)        (City)                        (Zip Code)

**ARTICLE V** (Insert any desired additional provision authorized by the Act; attach additional pages if needed.)

Signed this  20TH  day of  JUNE , 2014

By  ANN DUCHENE
      (Signature(s) of Organizer(s))

Ann L. Duchene
      (Type or Print Name(s) of Organizer(s))

*Miller v. Duchene et al*
Complaint

# Exhibit O

# AGREEMENT TO LICENSE

This agreement ("Agreement") is between INSPIRED BUSINESS DEVELOPMENT, LLC ("Licensor"), a Michigan Limited Liability Company doing business at 216 S. Bridge St, Grand Ledge in the State of Michigan and INSPIRED GREEN COLUMBUS, LLC, and its affiliates ("Licensee"), an Ohio Limited Liability Company with operations supported from 3193 Hulett Rd, Mason, MI, 48854, conducting business in Columbus Ohio as specified by Exhibit B "Territory Agreement" for a license to use the following trademarks, processes, copyrighted material, and intellectual property ("Product") as defined by this agreement and necessary for engaging in the Powered by Inspired Green Home Performance Closed Loop Process:

1. Inspired Green Logo as trademarked (Reg. No. 4,342,325; SER. NO. 85-744,361; Registered May 28, 2013)

2. Snap Pad Client Relationship Management System – Managed by Inspired Business Development and all previous client records/relationships within the defined Market Zones

3. All recorded training material from 2009 to current

4. Legal forms associated with the home performance sales and installation process

5. All collateral material design content and concepts related to residential energy efficiency

6. The Evidence Based Sales System as compiled (Presentation Book, Training Manual, and all other associated documents)

7. All forms associated with the home systems check up

8. All home performance pricing models

9. All accounting templates associated with residential home performance

10. All awards, articles, and interviews associated with Inspired Green

11. All process maps associated with residential home performance and staff acquisition

12. Home Performance Assessment report information gathering process and presentation format template

In consideration of the foregoing premises and the mutual covenants set forth in this Agreement and other valuable considerations, the parties agree as follows:

**1. License:** Licensor hereby grants Licensee a limited license to use Product for the permitted uses as set forth in this Agreement only. All other rights in and to the Product, including but not

7

.IM072

limited to all copyright and other intellectual property rights relating to the Product are retained by Licensor.

**2. Permitted Uses:** Licensee may only use the Product as follows:

A. Licensee may display Product either physically or electronically;

B. Licensee may extract or use information contained in Product for educational or research purposes, including extraction and manipulation of information for the purpose of illustration, explanation, example, comment, criticism, teaching, research, or analysis for internal training only;

C. Licensee may use Product as designed for the purpose of conducting daily client outreach, acquisition, and contracting of residential home performance services;

D. Licensor recognizes that any material, content, or process that already exists within the public domain (such as commonly accepted business best practices, sales methodology, or evidence from other published sources) is not covered by this agreement, though the unique language and composition associated with Product is covered;

E. Licensee affirms and accepts the perpetual requirement to use Product as designed at the execution of this agreement unless recorded or written consent is obtained by Licensor or its successors;

F. Licensee or its designee staff will participate in daily sales training events, daily mentoring, accounting procedures, and processes managed by Inspired Business Development, LLC that support this agreement as specified by Licensor;

G. Licensor reserves the right to audit Licensee's financial statements on a quarterly basis;

H. Licensee is required to use the Snap Pad Client Relationship Management system on a daily, accurate, and comprehensive basis to guarantee Licensor with transparent access to their company's performance, with full support of a designated Project Specialist employed by Licensor;

I. Licensee is required to use the Deep Dive client satisfaction survey system and a mandated field inspection process, as implemented by Licensor, for every residential home performance project to ensure protection of the Inspired Green brand reputation;

J. Licensee will work with Licensor to create a documented implementation plan and operating budget;

K.    Licensee may use Product as defined in this agreement anywhere within a geography encompassing 90,000 qualified single family homes as specified in a separate Territory Agreement

**3. Prohibited Uses:** Licensee is prohibited from the use of Product not expressly permitted in the preceding section. Prohibited uses include but are not limited to:

A.    Using any aspect of the Product as part of a trade-mark, design-mark, trade name;

B.    Incorporating the Product in any way that results in a re-distribution or reuse of the Product or is otherwise made available in a manner such that a third party can extract or access or reproduce Product;

C.    Using the Product in a manner that is considered under applicable law to be pornographic, obscene, immoral, infringing, defamatory or libelous in nature, or that would be reasonably likely cause any person or property reflected in the Product to be seen in a false light;

D.    Removing any notice of copyright, trade-mark or other proprietary right from any place where it is on or embedded in the Product;

E.    Sub-license, re-sell, rent, lend, assign, gift or otherwise transfer or distribute the Product; Licensee may not transfer this Agreement or any rights granted under this Agreement without the consent of Licensor, and such consent shall not be unreasonably withheld, delayed, or conditioned by Licensor;

F.    Conducting any business related to home upgrades outside of the context of this agreement in the assigned Market Zones.

**4. Term:** The grant of this license is effective as of the signing of this Agreement is perpetual unless terminated by Licensor due to violations of the terms of this Agreement. The license may be terminated by Licensor if at any time Licensee fails to comply with any of its terms of use as stated in this Agreement and Licensor can reasonably demonstrate this infraction. Upon termination, Licensee must immediately cease all use of Product and if requested, confirm to Licensor in writing compliance with these requirements.

Licensor further reserves the right to elect at a later date to revoke or amend the license granted by this Agreement upon notice, sent to the address or contact information provided by Licensee, for violation or deviation from the terms set herein.

**5. Payment:** Licensee agrees to pay Licensor the following for use of Product:

A.    $30,000 USD Single Zone License Acquisition fee paid per Market Zone at execution.

JM072

B.  12% revenue share for all revenue collected from retrofit project sales or installations within the assigned Market Zones;

C.  Payment shall be due to Licensor on the Tuesday of each week following the week of revenue collected.

**6. Warranties:** Licensor grants no rights and makes no warranties regarding the use of names, people, trademarks, trade dress, patented or copyrighted designs or works of art or architecture or other forms of intellectual property represented in any Product.

THE PRODUCT IS PROVIDED "AS IS" WITHOUT REPRESENTATION, WARRANTY OR CONDITION OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED REPRESENTATIONS, WARRANTIES OR CONDITIONS OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. LICENSOR DOES NOT REPRESENT OR WARRANT THAT THE PRODUCT WILL MEET LICENSEE'S REQUIREMENTS OR THAT ITS USE WILL BE UNINTERRUPTED OR ERROR FREE EXCEPT AS SPECIFIED HEREIN. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PRODUCT IS WITH LICENSEE UNLESS SPECIFIED HEREIN. LICENSEE ASSUMES THE ENTIRE RISK AND COST OF ALL NECESSARY CORRECTIONS DURING ITS USE OF PRODUCT. LICENSEE ASSUMES FULL TRANSFER OF AND ACCEPTS ALL HISTORICAL INSTALLATION WARRANTY AND SERVICE ISSUES ASSOCIATED WITH ALL PREVIOUS RESIDENTIAL RETROFIT CLIENTS OF LICENSOR WITHIN LICENSEE'S ASSIGNED TERRITORY.

**7. Indemnification:** Each party shall indemnify, assume the defense of, and hold harmless the other party and its directors, officers, employees, and agents from every claim, loss, damage, injury, expense (including attorney's fees), judgment, and liability of every kind, nature, and description arising in whole or in part from the indemnifying party's negligent, fraudulent, or illegal acts or omissions except, as to the party requesting indemnification, to the extent such Liability results in whole or in part from the unauthorized, negligent, fraudulent, or illegal act or omission of the party requesting indemnification.

**8. Amendments to License:** This license may only be amended by a writing signed by Licensee and authorized by Licensor.

**9. Legal Disputes:** This Agreement shall be governed by the laws of the state of Michigan. The parties waive any right to argue conflict of law principles. The Parties agree that any claim or dispute between them or against any agent, employee, successor, or assignee of the other, whether related to this Agreement or otherwise, and any claim or dispute related to this Agreement shall be first taken to binding arbitration. Any award of the arbitrator may be entered as a judgment in any court of competent jurisdiction. Further, should either party, successor or assignee of either party bring leading proceedings in connection with this Agreement the party or parties prevailing in such proceeding shall be entitled to their reasonable attorney's fees and costs from the non-prevailing party in addition to any other such relief as may be granted.

**10. Non-waiver:** No failure or neglect of either party hereto in any instance to exercise any right, power or privilege under this Agreement or under applicable law shall constitute a waiver of any

JM072

other right, power or privilege in any other instance. All waivers by either party must be in wiring and signed by the party to be charged.

**11. Entire Agreement:** This Agreement and its addenda A and B contain the entire agreement and understanding between the parties and supersedes any prior or contemporaneous written or oral agreements, representations and warranties between them respecting the subject matter of this Agreement. This Agreement may be amended only by a writing signed by Licensee and by a duly authorized representative of the Licensor. If any term, provision, covenant or condition of this Agreement, or the application to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

By signing this Agreement the parties acknowledges they have read the entire agreement and fully understand the terms, conditions and obligations of this Agreement.

Licensee

_____
Authorized Signature
On Behalf of Inspired Green Columbus, LLC

_9-17-14_____
Date

Licensor

_____
Denny Duchene – It's CEO

_9/17/2014_____
Date

JM072